FILED - VM
GLYNN CO. CLERK'S OFFICE
Filed 1/21/2025 3:45 PM
Accepted 1/24/2025 8:28 AM
CASE # CE25-00058

*Rebecca J Walden*
CLERK SUPERIOR COURT

IN THE SUPERIOR COURT OF GLYNN COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| JR MEDIA CO., LLC AND<br>CHRISTA HURLEY | * * * | |
| Petitioners, | * * | |
| v. | * * | Civil Action No. CE25-00058 |
| VERDE OUTDOOR MEDIA, LLC, | * * * | JUDGE LANE |
| Respondent. | * | |

## PETITION FOR DECLARATORY JUDGMENT

Pursuant to O.C.G.A. § 9-4-1 *et seq.*, Petitioners JR Media Co., LLC and Christa Hurley file this Verified Petition for Declaratory Judgment representing to the Court as follows:

### Parties, Jurisdiction, and Venue

1.

Petitioner JR Media Co., LLC (collectively with Petitioner Christa Hurley is hereinafter referred to as "Petitioners") is a domestic limited liability company organized and operating under the laws of the State of Georgia with its principal place of business located in Glynn County, Georgia.

2.

Petitioner Christa Hurley is a resident of the State of Georgia who subjects herself to the jurisdiction of this Court by the filing of this Petition.

3.

Respondent Verde Outdoor Media, LLC (hereinafter "Respondent") an Arizona limited liability corporation that can be served through its registered agent Steven P. Johnson at 1720 W. Rio Salado Pkwy Tempe, Arizona 85281.

1

4.

On or about October 29, 2021, Respondent and Petitioners entered into a Membership Interest Purchase Agreement (hereinafter the "Agreement'). A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

5.

Pursuant to Section 9.12 of the Agreement, "[t]he Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia without giving effect to any choice or conflict of law provision or rule (whether of the State of Georgia or any other jurisdiction)."

6.

Pursuant to Section 9.13 of the Agreement, "[a]ny legal suit or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Georgia, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

7.

Because Petitioner JR Media Co., LLC maintains its principal place of business in Glynn County, Georgia, a substantial part of the events giving rise to the present dispute and the business related to the Agreement was transacted in Glynn County, Georgia.  Representatives of Petitioner JR Media Co., LLC were located in Glynn County, Georgia for the vast majority of the negotiations with Respondent that gave rise to the Agreement.  Furthermore, Respondent directed numerous electronic, telephonic, and written messages into Glynn County, Georgia related to the Agreement which gives rise to the present dispute.

8.

Subject matter jurisdiction is proper before this Court.

9.

This Court has personal jurisdiction over Respondent.

10.

Venue is proper before this Court.

**Factual Allegations**

11.

Petitioners hereby incorporate all preceding paragraphs by reference.

12.

Petitioners, along with others, were Members of two Georgia limited liability companies (hereinafter the "Businesses") that owned, developed, operated, and managed outdoor advertising structures (i.e. billboards) (hereinafter "Assets").

13.

On or about October 29, 2021, Respondent and Petitioners (along with other "Sellers" as that term is defined by the Agreement) entered into the Agreement whereby Respondent agreed to purchase and Petitioners (along with other "Sellers") agreed to sell some or all of their membership interests in the Businesses (hereinafter "Membership Interests").

14.

Pursuant to Section 1.03(a) of the Agreement, Respondent agreed to pay Petitioners (along with other "Sellers") for their Membership Interests based upon a formula that characterized each of the Assets as falling within one of three (3) categories: "Existing Sites", "Permitted Development Sites", or "Unpermitted Development Sites".

15.

"Existing Sites" were generally defined under the Agreement as the Assets that were operational at the time of the Agreement.

16.

The Purchase Price for the "Existing Sites" was generally calculated as a 10x multiple of the existing cash flow from this category of the Assets.

17.

"Permitted Development Sites" were generally defined under the Agreement as the Assets that were already permitted for development but were not yet operational at the time of the Agreement. A complete list of the Assets identified as "Permitted Development Sites" under the Agreement are attached as Schedule 3 to Exhibit A.

18.

The Purchase Price for the "Permitted Development Sites" was generally calculated as a 10x multiple of the expected cash flow (the "Permitted Development BCF") from this sub-category of the Assets once they became operational.

19.

"Unpermitted Development Sites" were generally defined under the Agreement as the Assets that were "not yet permitted but [were] scheduled to be permitted within six (6) months of the Closing and operational within twelve (12) months after the Closing". A complete list of the Assets identified as "Unpermitted Development Sites" under the Agreement are attached as Schedule 3 to Exhibit A.

4

20.

The Purchase Price for the "Unpermitted Development Sites" was generally calculated at a 8x multiple of the expected cash flow (the "Unpermitted Development BCF") from this sub-category of the Assets once they became operational.

21.

The "Closing Date" was defined by the Agreement as October 29, 2021, but with the actual Closing of the transaction contemplated by the Agreement to occur on November 1, 2021. *See* Exhibit A at Section 1.04.

22.

At the Closing, Respondent paid a total Purchase Price of $45,488.541.91 for the Assets based upon the formula outlined in the Agreement, in the form of actual cash payments, promissory notes, and further payment obligations.

23.

From this Purchase Price, $11,159,915.02 was allocated to or for the benefit of Petitioner JR Media Co., LLC for its Membership Interests (in the form of an actual cash payment, a promissory note, and further payment obligations).

24.

From this Purchase Price, $16,739,872.54 was allocated to or for the benefit of Petitioner Christa Hurley for her Membership Interests (in the form of an actual cash payment, a promissory note, and further payment obligations).

25.

Section 1.03(b) of the Agreement, however, contained, *inter alia*, terms for the "Post-Closing Adjustments" to the Purchase Price related to the "Permitted Development Sites" and the "Unpermitted Development Sites".

26.

Pursuant to Section 1.03(b)(i)(B) of the Agreement, the Purchase Price for each "Permitted Development Site" that "is constructed and becomes operational within twelve (12) months after Closing (barring a reasonable delay due to the occurrence of a Force Majeure Event)" would be adjusted to reflect the actual cash flow for the twelve (12) full calendar months of operation, which began **the later of**: (1) thirty (30) days after the Closing Date; or (2) the date that is thirty (30) days following the beginning of the operation the Asset.

27.

Likewise, Section 1.03(b)(i)(B) of the Agreement provided that the Purchase Price for each "Unpermitted Development Site" that "is permitted within six (6) months after Closing and that is constructed and becomes operational within twelve (12) months after the Closing (barring a reasonable delay due to the occurrence of a Force Majeure Event)" would be adjusted to reflect the actual cash flow for the twelve (12) full calendar months of operation, which began **the later of**: (1) thirty (30) days after the Closing Date; or (2) the date that is thirty (30) days following the beginning of the operation the Asset.

28.

Significantly, however, the timelines established by Section 1.03(b)(i)(B) of the Agreement, the stated timeframes for completion (in the case of "Permitted Development Sites")

or permitting and completion (in the case of "Unpermitted Development Sites") were expressly tolled under the Agreement in the event of a "Force Majeure Event".

29.

A "Force Majeure Event" is defined by the Agreement as "any of the following events the results of which, directly or indirectly, cause a material delay or disruption in the development or operation of a Structure in the context so described: (i) acts of God, including but not limited to, hurricanes, floods, fires, earthquakes, explosions, or other natural disasters; and (ii) unexpected changes in government authority, proclamations, orders, laws or actions." *See* Exhibit A at Section 1.03(b)(i)(B).

30.

Section 1.03(b)(i)(B) of the Agreement further unequivocally and expressly states that with respect to the time periods used for the "Post-Closing Adjustments" and, in particular, "periods of time during which the actual billboard cash flow of such Structure [either a "Permitted Development Site" or an "Unpermitted Development Site"] is materially impacted the occurrence of a 'Force Majeure Event', **it being the intent of the Parties to toll the time periods described herein.**"

31.

Included in the scheduled list of "Unpermitted Development Sites" under the Agreement were a group of seven (7) billboard sites in located in North Charleston, SC which are commonly referred to as the Charleston 7 or "CHS7".

32.

Included in the Purchase Price, Respondent paid Petitioners $3,285,164.76 for the CHS7 at Closing under the formula established by Section 1.03(a), but subject to the "Post-Closing Adjustments" provisions contained in Section 1.03(b).

33.

Pursuant to Section 1.03(b)(i)(B) of the Agreement, the CHS7 were required to be permitted not later than six (6) months after the Closing Date, or May 1, 2022, but subject to the automatic tolling of this deadline in the event of a Force Majeure Event".

34.

Pursuant to Section 1.03(b)(i)(B) of the Agreement, the CHS7 were required to be operational within twelve (12) months after the Closing Date, or November 1, 2022, but subject to the automatic tolling of this deadline in the event of a "Force Majeure Event".

35.

Five (5) of the seven (7) CH7 billboard sites were never permitted.

36.

Two (2) of the CHS7 billboard sites were permitted on December 12, 2022, more than six (6) months after the Closing Date.

37.

These two (2) CHS7 Sites became operational not later than February 1, 2023. more than twelve (12) months after the Closing Date.

38.

The two (2) CHS7 Sites that were developed are commonly referred to as the Charleston 2 or "CHS2".

39.

Pursuant to Section 1.03(b) of the Agreement, the end of the twelve (12) full calendar months of operation constituted the "True-Up Date" for each "Permitted Development Site" or "Unpermitted Development Site".

40.

Within sixty (60) days after each "True-Up Date", Respondent was obligated, pursuant to Section 1.03(b)(i)(B), to prepare and deliver to Petitioners (along with the other Sellers) a "Development BCF True-Up Statement" along with reasonable supporting documentation that compared the estimated cash flow upon which the Purchase Price was calculated at Closing to the actual cash flow at the end of the twelve (12) full calendar months of operation to determine the adjustment to the Purchase Price for such Asset.

41.

Petitioners (along with the other Sellers) then had thirty (30) days from receipt of Respondent's "Development BCF True-Up Statement" to review and raise any issues with the "Development BCF True-Up Statement". *See* Exhibit A at Section 1.03(b)(i)(B).

42.

Despite the plain language of the Agreement, Respondent did not timely provide a "Development BCF True-Up Statement" for any of the "Permitted Development Sites" or "Unpermitted Development Sites" as required by the Agreement.

43.

On or about August 27, 2024, Respondent provided Petitioners with information from which a "Development BCF True-Up Statement" could be generated for all of the "Permitted Development Sites" or "Unpermitted Development Sites" and demanding repayment of

$4,206,737.90 from Petitioner Christa Hurley and $2,804,491.93 from Petitioner JR Media Co., LLC under the "Post-Closing Adjustments" provision of the Agreement.

44.

Petitioners reviewed the information provided by Respondent, disputing $1,529,336.51 in combined charge-backs, and other "Post-Closing Adjustments" assessed to Petitioners that were not supported by the Agreement.

45.

Ultimately, Respondent and Petitioner resolved $224,053.84 of the $1,529,336.51 in dispute in Petitioners' favor.

46.

The remaining $1,305,282.67 in dispute between Petitioners and Respondent concerns Respondent's granting of a $0.00 valuation for the developed and operating CHS2 billboard sites on the grounds that these billboard sites were not permitted or operational in the time provided by Section 1.03(b)(i)(B) of the Agreement.

47.

The five (5) CH7 billboard sites that were never developed are not in dispute.

48.

Petitioners, however, disagree with Respondent's position as to the $0.00 value ascribed to CHS2 considering that the delay in the permitting, construction, and operation of these billboard sites was a direct result of unexpected changes in governmental authority, proclamations, orders, laws and actions, i.e. a "Force Majeure Event" under the express terms of the Agreement.

49.

The lease for real property on which the CHS7 billboards were to be located was initially executed on August 16, 2021, that is, more than two months (2) prior to the execution of the Agreement. A true and correct copy of the August 16, 2021 lease is attached hereto as **Exhibit B** (the "Lease").

50.

The Lease was entered into after undertaking due diligence into the site, as well as the local and state permitting process to warrant that the CHS7 billboard sites could be permitted and developed.

51.

Indeed, the Lease for the CHS7 began on October 1, 2021, that is, less than two (2) months after the Lease was executed and one (1) month before the Closing Date.

52.

The Lease term would not have commenced so soon after its execution and before the Closing Date absent a reasonable belief that the permits for its development would be timely issued.

53.

Respondent undertook extensive due diligence into Sellers' business prior to the Closing of the transaction, including due diligence into the CHS7 billboard sites.

54.

Respondent would not have agreed to pay Sellers for the CHS7 billboard sites absent a reasonable belief that the permits for its development would be timely issued.

55.

In other words, Petitioners (as well as the other Sellers) and Respondent were all operating under the belief and expectation that the CHS7 billboard sites would be timely permitted and developed at the time that the Agreement was executed.

56.

After the Closing of the transaction, however, the local governing authority, that is, the City of North Charleston, refused to issue permits for the CHS7 billboard sites.

57.

For nearly a year after Closing, Respondent undertook efforts to compel the City of North Charleston to issue the permits for the CHS7 billboard sites.

58.

During this time, Respondent repeatedly and consistently took the position that the City of North Charleston was legally obligated to issue the permits for the CHS7 billboard sites.

59.

Despite Respondent's efforts, the City of North Charleston refused to issue permits for the CHS7 billboard sites.

60.

On or about December 12, 2022, the City of North Charleston did issue the permits for the CHS2 billboard sites.

61.

Respondent could have secured the permits for the CHS2 billboard sites at any time during the nearly year--long time period that it was trying to compel the City of North Charleston to issue the permits for the CHS7 billboard sites.

62.

In other words, Respondent made the unilateral choice to forgo the permits for the CHS2 billboard sites in an effort to try to secure the permits for all seven (7) of the CHS7 billboard sites.

63.

Ultimately, the City of North Charleston refused to issue the permits for remaining five (5) billboard sites composing the CHS7 billboard sites– a position that Respondent neither agreed with nor expected.

64.

This unexpected refusal by the City of North Charleston constitutes a "Force Majeure Event" under the express terms of the Agreement thereby tolling and extending the Post-Closing Adjustment time periods for permitting and operation of "Unpermitted Development Sites" under Section 1.03(b)(i)(B).

65.

Indeed, Respondent has given another Seller (not Petitioners) credit for CHS2 billboard sites despite the fact that these billboard sites were permitted more than six (6) months after the Closing Date, and were operational more than twelve (12) months after the Closing Date, thereby expressly or tacitly acknowledging that such delays were caused by "Force Majeure Event."

66.

Despite previously giving the value of the CHS2 billboard sites to another Seller, Respondent is now refusing to give credit for the CHS2 billboard sites to Petitioners citing to the plain language of the Agreement and taking the position that the CHS2 billboard sites were not timely permitted or constructed and were not subject to a "Force Majeure Event."

67.

Petitioners have disputed Respondent's position on the grounds that the plain language in Section 1.03(b)(i)(B) of the Agreement and the express intent of the Parties as reflected not only by this plain language, as well as the entirety of the Agreement requires Respondent to give pay Petitioners for the CHS2 billboard sites as required pursuant to the Agreement.

68.

Respondent has acted in bad faith, been stubbornly litigious and has caused Petitioners unnecessary trouble and expense entitling Plaintiff to recover its costs of this litigation, including reasonable attorneys' fees and expenses pursuant to O.C.G.A. § 13-6-11.

## **COUNT I – DECLARATORY JUDGMENT**

69.

Petitioners hereby incorporates all preceding paragraphs by reference.

70.

Petitioners assert this action for declaratory judgment pursuant to O.C.G.A. § 9-4-1 *et seq.*

71.

Respondent and Petitioners (along with other "Sellers") entered into the Agreement whereby Respondent agreed to purchase and Petitioners (along with other "Sellers") agreed to sell some or all of their Membership Interests in their outdoor advertising businesses.

72.

Pursuant to the Agreement, Respondent paid Petitioners a Purchase Price pursuant to the formula in Section 1.03(a).

73.

Pursuant to the Agreement, the Purchase Price was subject to "Post Closing Adjustments" as provided in Section 1.03(b)(i)(B).

74.

Pursuant to the Agreement, the timeframes established by Section 1.03(b) of the Agreement for the permitting and operation of the CHS7 billboard sites (such billboard sites being "Unpermitted Development Sites") were expressly tolled under the Agreement in the event of a "Force Majeure Event".

75.

The CHS2 billboard sites were not timely permitted as the result of a "Force Majeure Event."

76.

The Agreement is clear that Petitioners are entitled to a tolling of the timeframe established by Section 1.03(b) for the permitting and operation of the CHS7 billboard sites in the event of a "Force Majeure Event."

77.

Respondent has given another Seller credit for CHS2 billboard sites despite the fact that these billboard sites were permitted more than six (6) months after the Closing Date, and were operational more than twelve (12) months after the Closing Date, thereby expressly or tacitly acknowledging that such delays were caused by "Force Majeure Event."

78.

Nonetheless, Respondent is refusing to give Petitioners credit for the CHS2 billboard sites despite the plain language of the Agreement requiring a tolling of the timeframe established by

Section 1.03(b) for permitting and operation of the CHS7 billboard sites, and Respondent's admissions that the permitting and development of the CHS2 was delayed as a result of a "Force Majeure Event."

79.

As a consequence of the forgoing, Petitioners are uncertain as to their rights, interests, status, and legal relations with respect to Respondent and the "Post-Closing Adjustments" to the Purchase Price as a result of the plain language of the Agreement, as well as the irreconcilable inconsistency between Respondent's refusal to give Petitioners credit for the CHS2, despite giving this credit to another Seller.

80.

Accordingly, Petitioners are entitled to declaratory judgment as to the rights, interests, status, and legal relations to Respondent, including but not limited to, a judgment declaring that:

(1) the Agreement plainly and unambiguously requires the tolling of the timeframes established by Section 1.03(b) for the permitting and operation of "Unpermitted Development Sites" due to the occurrence of a "Force Majeure Event";

(2) the delays in the permitting and development of the CHS2 billboard sites were the result of a "Force Majeure Event";

(3) Petitioners are entitled to a tolling of the timelines established by Section 1.03(b) for the "Post-Closing Adjustments" to the Purchase Price for the CHS2;

(4) the "Post-Closing Adjustment" period for the CHS2 began to run on or about February 1, 2023; and

(5) Petitioners are entitled to credit for the CHS2 billboard sites based on the actual cash flow for such sites' twelve (12) full calendar months of operation starting on February 1, 2023.

**WHEREFORE**, having filed this Complaint for Declaratory Judgment, Petitioners pray as follows:

(a) That this Court enter an order declaring the rights of the Parties as more specifically set forth herein;

(b) That this Court award fees and expenses to Petitioners pursuant to O.C.G.A. § 13-6-11 and other applicable law;

(c) That this Court award any other relief deemed necessary or just.

Respectfully submitted this 21 day of January, 2025.

                                          **ROBERTS TATE, LLC**

                                          */s/ Jason M. Tate*
                                          Jason M. Tate
                                          Georgia Bar No. 140827
                                          Attorney for Petitioners

2487 Demere Rd.
Suite 400
St. Simons Island, Georgia 31522
(912) 638-5200
(912) 638-5300 – Fax
jtate@robertstate.com