# EXHIBIT A

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**") is entered into on October 29, 2021 but made effective as of November 1, 2021 (the "**Effective Date**") by and among John E. Renfroe, a Georgia resident ("**Jed Renfroe**"); Christa R. Hurley, a Georgia resident ("**Christa Hurley**"); JR Media Co., LLC, a Georgia limited liability company ("**JR Media**"); A.P.E. Holdings, LLC, a Georgia limited liability company ("**APE**," and together with Jed Renfroe, Christa Hurley and JR Media, the "**Sellers**" and each a "**Seller**"); Verde Outdoor Media, LLC, an Arizona limited liability company ("**Buyer**"); each of Renfroe Outdoor, LLC ("**Renfroe Georgia**") and Renfroe Outdoor SC, LLC ("**Renfroe SC**" and together with Renfroe Georgia, the "**Companies**" and each a "**Company**"), each a Georgia limited liability company; and with respect to ARTICLE IV, ARTICLE V, ARTICLE VII, <u>Section 8.03</u> and ARTICLE IX only, with respect to each of Jed Renfroe, Christa Hurley, and the owner(s) of JR Media and APE (in each case, an "**Owner**", and each of such Owner(s) together with the affiliated Seller, the "**Seller Parties**"). Sellers, Buyer and the Companies are sometimes hereinafter collectively referred to as the "**Parties**" and individually as a "**Party**".

## RECITALS

A.     Each Company is in the business of developing and managing outdoor advertising structures (each, a "**Structure**") on real property owned in fee or accessed pursuant to easements and leases (the location of each such parcel of real property, a "**Site**");

B.     Each Seller owns the Units of each Company set forth opposite its name on <u>Schedule 1-A</u> hereto (with respect to each Seller, the "**Owned Units**") and desires to sell the portion of such Owned Units set forth opposite its name on <u>Schedule 1-A</u> hereto (with respect to each Seller, the "**Purchased Units**");

C.     Pursuant to that certain (i) Amended and Restated Operating Agreement of Renfroe Georgia, dated October 10, 2018 (the "**Renfroe Georgia LLC Agreement**") or (ii) Operating Agreement of Renfroe SC, dated January 1, 2020 (the "**Renfroe SC LLC Agreement**" and together with Renfroe Georgia LLC Agreement, the "**LLC Agreements**" and each an "**LLC Agreement**"), as applicable, the Purchased Units are Membership Interests (as defined in such applicable LLC Agreement) of each Company and are governed by and have the rights set forth in such applicable LLC Agreement;

D.     Each Seller wishes to sell to Buyer, and Buyer wishes to purchase from such Seller, the applicable Purchased Units, subject to the terms and conditions set forth herein; and

E.     On completion of the transfer of the Purchased Units pursuant to this Agreement, the Buyer shall own 85% of the Membership Interests in each Company and Jed Renfroe shall own 15% of the Membership Interests in each Company.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are

hereby acknowledged, the Parties hereto agree as follows:

**ARTICLE I**
**PURCHASE AND SALE**

**Section 1.02    Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined herein), each Seller shall sell to Buyer, and Buyer shall purchase from such Seller, all of such Seller's right, title and interest in and to the applicable Purchased Units, free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance ("**Encumbrance**"), for the consideration specified in Section 1.03. For purposes hereof, all of such Seller's right, title, and interest in and to such Purchased Units shall include, but is not limited to: (a) the pro rata portion based on the percentage of applicable Purchased Units of the applicable Company purchased from such Seller relative to such Seller's Owned Units of such Company (with respect to each Seller, the "**Pro Rata Portion**") such Seller's capital account in each Company; (b) except as provided in Section 6.02, such Seller's right to share in the profits and losses of each Company with respect to such Purchased Units; (c) except as provided in Section 6.04, such Seller's right to receive distributions with respect to such Purchased Units; and (d) all voting rights attributable to the applicable Purchased Units.

**Section 1.03    Purchase Price.**

(a)    <u>Closing Date Purchase Price</u>.

(i)    The aggregate Closing Date purchase price for all the Purchased Units shall be [●] as such amount may be adjusted in accordance with Section 1.03(b) (the "**Purchase Price**").

(ii)    The Parties acknowledge that the Purchase Price is the sum of the value of (i) the existing billboard cash flow from all Sites set forth on Schedule 3 hereto identified as the "Existing Sites" which are now in operation (the "**Existing BCF**"), (ii) the expected billboard cash flow from all Sites set forth on Schedule 3 hereto identified as the "Permitted Development Sites" which are now permitted for development (the "**Permitted Development BCF**"), (iii) the expected billboard cash flow from all Sites set forth on Schedule 3 hereto identified as the "Unpermitted Development Sites" which are not yet permitted but are scheduled to be permitted within six (6) months after Closing and operational within twelve (12) months after Closing (the "**Unpermitted Development BCF**") and (iv) the Accounts Receivables (as defined below) of the Companies. The Purchase Price is intended to fairly value the Companies and the 85% Membership Interests purchased by Buyer based on a 10x multiple of Existing BCF (except with respect to the Tanger Board (as defined herein) which shall be valued at a 5x multiple of its Existing BCF) and Permitted Development BCF and an 8x multiple of Unpermitted Development BCF (to include the SC 7-Digital Package (as defined below)). The calculation of the Purchase Price is based on the August 31, 2021

2

Financial Statements (as defined herein) and other financial information provided by the Companies attached hereto as Schedule 1-B.[1]

(iii) **Accounts Receivable Recapture**. Notwithstanding anything to the contrary contained within this Agreement, the Purchase Price shall include all accounts receivables of the Companies on the Closing Date (the "**Accounts Receivables**"). Following the Closing Date, all such Accounts Receivables shall be collected and retained by the Companies consistent with each's collection practices prior to the Closing Date. On the third (3rd) Business Day following the date that is one hundred twenty (120) days from the Closing Date (the "**AR Recapture Date**"), the Companies shall present to Sellers the amount of the Accounts Receivables that remain uncollected as of the AR Recapture Date, which amount shall be paid back to the Companies by the Sellers, in accordance with their Pro Rata Portion, within three (3) Business Days thereafter.

(iv) The Purchase Price shall be payable by Buyer at the Closing as follows:

(i) first, on behalf of each applicable Company, in accordance with the Payoff Letters (as defined in Section 5.02(a)(iv)(B) hereof) and the Prorations (as defined in Section 5.02(a)(v)(D) hereof) if not previously discharged directly by the Companies and/or Sellers; and

(ii) thereafter, (1) to each Seller, the respective aggregate cash amount as identified on Schedule 1-A (the "**Closing Cash Payment**"); and (2) to each of Jed Renfroe, Christa Hurley, APE and JR Media, a non-negotiable demand note (each, a "**Note**," and together, the "**Notes**") for the remaining amount of the Purchase Price not paid pursuant to the Closing Cash Payment, in a form to be agreed upon, in good faith, between the Parties prior to Closing. For the avoidance of doubt, the Closing Cash Payment for each Seller shall be its Pro Rata Portion of an amount equal to (i) the full amount of the Purchase Price attributable to the Existing BCF, (ii) the full amount of the Purchase Price attributable to the Permitted Development BCF, (iii) twenty-five percent (25%) of the amount of the Purchase Price attributable to the Unpermitted Development BCF (the "**Unpermitted Cash Payment**"), and (iv) the Accounts Receivables of the Company. Further, the amount of each Note shall be each of Jed Renfroe's, Christa Hurley's, APE's and JR Media's Pro Rata Portion of fifty percent (50%) of the amount of the Purchase Price attributable to the Unpermitted Development BCF (which, together with the Unpermitted Cash Payment,

---

[1] Subject to continuing Cmpany tax review.

represent seventy-five percent (75%) of the Purchase Price attributable to the Unpermitted Development BCF).

(iii)    Within five (5) Business Days of the date that all Unpermitted Development Sites become fully operational, the Notes for each of Jed Renfroe, Christa Hurley, and JR Media shall be paid in full by Buyer bringing the total cash amount paid to Sellers for the Unpermitted Development BCF to a value that is seventy-five percent (75%) of the Purchase Price attributable to the Unpermitted Development BCF. The remaining twenty-five percent (25%) of the amount of the Purchase Price attributable to the Unpermitted Development BCF shall be paid at the time of the Net Adjustment (as defined below) and shall be subject to the Purchase Price adjustment as described in Section 1.03(b)(i)(D).

(b)    <u>Post-Closing Adjustments</u>.

(i)    Development Sites.

(A)    The Sellers (and not the Companies) shall pay directly all costs of development, permitting and construction of each of the Permitted Development Sites and Unpermitted Development Sites set forth on <u>Schedule 3</u> hereto and the costs associated with securing the ground lease for the Tanger Board as set forth in <u>Section 1.03(b)(ii)</u> hereto.

(B)    The Permitted Development BCF and the Unpermitted Development BCF amounts included in the Purchase Price are estimates of the billboard cash flow from twelve (12) months of operation of each of the Structures (the "**Estimated BCF**"). For each Structure included in the Permitted Development BCF that is constructed and becomes operational within twelve (12) months after Closing (barring a reasonable delay due to the occurrence of a Force Majeure Event) and for each Structure included in the Unpermitted Development BCF that is permitted within six (6) months after Closing and that is constructed and becomes operational within twelve (12) months after Closing (barring a reasonable delay due to the occurrence of a Force Majeure Event), the actual billboard cash flow of each such Structure for twelve (12) full calendar months of operation, such period beginning on the later of (i) the date that is thirty (30) days following the Closing Date and (ii) the date that is thirty (30) days following the beginning of such Structure's operation (not including any periods of time during which the actual billboard cash flow of such Structures is materially impacted by the occurrence of a Force Majeure Event, it being the intent of the Parties to toll the time periods described herein), shall be calculated (the "**Actual BCF**"). The end of the twelve (12) full calendar months of operation of each such Structure (not including the initial start-up period) shall be the "**True-Up Date**" for each such Structure. Within sixty (60) days

4

after the True-Up Date of each such Structure, the Actual BCF of the Structure shall be compared to the Estimated BCF for such Structure. If the Actual BCF of any such Structure exceeds the Estimated BCF for that same Structure, the Purchase Price shall be adjusted accordingly, that is, the Actual BCF shall be deemed to replace the Estimated BCF for purposes of Purchase Price determination. If the Actual BCF is greater than the Estimated BCF for such Site, the Purchase Price shall increase by an amount equal to the difference in the Estimated BCF and the Actual BCF multiplied by the respective multiple (that being 10x for a Permitted Development Site and 8x for an Unpermitted Development Site) for such Site at the time of Closing. Conversely, if the Actual BCF of any such Structure is less than the Estimated BCF for that same Structure, the Purchase Price shall be reduced by an amount equal to the difference in the Estimated BCF and the Actual BCF multiplied by the respective multiple (that being 10x for a Permitted Development Site and 8x for an Unpermitted Development Site) for such Site at the time of Closing. Within sixty (60) days after each True-Up Date the Company shall prepare and deliver to Sellers and Buyer a statement setting forth the Actual BCF for each such Structure, together with reasonable supporting documentation, and comparison to the Estimated BCF for that same Structure to yield an adjustment to the Purchase Price, if any (the "**Development BCF True-Up Statement**"). A "**Force Majeure Event**" as used above shall be any of the following events the results of which, directly or indirectly, cause a material delay or disruption in the development or operation of a Structure in the context so described above: (i) acts of God, including, but not limited to, hurricanes, floods, fires, earthquakes, explosions, or other natural disasters; and (ii) unexpected changes in governmental authority, proclamations, orders, laws or actions.

(C)     After receipt of a Development BCF True-Up Statement, Buyer and Sellers shall have thirty (30) days to review the Development BCF True-Up Statement (with respect to each Development BCF True-Up Statement, the "**Review Period**"). If a dispute exists between Buyer and Sellers regarding the Actual BCF (and therefore a difference in the adjustment to the Purchase Price), Buyer and Sellers shall present to one another the amount that each believes to be the value of the Actual BCF. At the election of either Buyer or Sellers, the independent accountants to the Companies may provide their opinions and remarks which shall be conclusive and binding upon the Parties. The fees and expenses of the independent accountants for such Company shall be paid by such Company unless the amount put forward by the Sellers is more than 25% above the amount provided by the independent accountants', in which case the fees and expenses shall be paid entirely by the Sellers.

5

(D)     After the last Development BCF True-Up Statement is produced and accepted by the Sellers and the Buyer, all adjustments to the Purchase Price required thereby shall be made collectively, with increases being offset by reductions, to produce a single net adjustment to the Purchase Price (the "**Net Adjustment**"). If the Net Adjustment increases the Purchase Price then the Buyer shall pay to Sellers in cash each of the Sellers' respective portion of the Net Adjustment (as determined by each Seller's Purchased Units) and pay the Notes in full, if not previously paid pursuant to Section 1.03(a)(iv)(iii). Conversely, if the Net Adjustment decreases the Purchase Price then each Seller shall pay to Buyer their respective portion of the Net Adjustment. If not previously paid pursuant to Section 1.03(a)(iv)(iii), such Notes, as well as any additional amounts owed to Sellers as a result of an increased Purchase Price shall be due and payable to Sellers within five days after determination of the Net Adjustment.

(ii)     **Tanger Board**. If on or prior to the date which is six (6) months after the Closing Date, the Sellers, at their own expense, secure a ground lease for Renfroe Georgia with the landowner for the Site located at Tanger Outlet, 200 Tanger Outlets Blvd, Pooler, Georgia 31322 for a term of ten or more years and a landowner revenue share not in excess of 20% and such other terms as are reasonably acceptable to Buyer, then Buyer shall, within five (5) Business Days after execution of such ground lease make payment of $[●] (that being the difference in a 8x multiple of the Tanger Board's Existing BCF and the 5x multiple of the Tanger Board's Existing BCF previously included within the Purchase Price) by wire transfer in immediately available funds, to the Sellers in accordance with their Pro Rata Portion applicable to the Renfroe Georgia Purchased Units as of the Closing Date.

**Section 1.04     Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely via the electronic exchange of documents and signatures on October 29, 2021 (the "**Closing Date**"). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. Eastern Standard Time on November 1, 2021. For the avoidance of doubt, this sale is being consummated at the Buyer's office location. Except as required in respect of the Payoff Letters, all payments by Buyer are to be wired in accordance with the wire instructions set forth on Schedule 2.

**Section 1.05     Transfer Taxes.** Sellers and Buyer shall share equally any sales, use or transfer taxes, documentary charges, recording fees or similar taxes, charges, fees or expenses, if any, that become due and payable as a result of the transactions contemplated by this Agreement. The Sellers and the Buyer each acknowledge that they know of no sales, use or transfer taxes, documentary charges or similar taxes, charges, fees or expenses that would be due and payable as a result of the transactions contemplated by this Agreement, other than nominal fees for recording real estate transfer documents.

6

**Section 1.06    Withholding Taxes.** Buyer shall be entitled to deduct and withhold from the Purchase Price all taxes that Buyer may be required to deduct and withhold under any provision of tax law with respect to the transaction contemplated by this Agreement. All such withheld amounts shall be treated as delivered to Sellers hereunder. The Sellers and the Buyer each acknowledge that they know of no such taxes that Buyer would be required to deduct and withhold under any provision of tax law.  In the event Buyer believes that any such withholding is required, before any amounts are withheld, Buyer shall notify Sellers of any such withholding requirement and give each Seller an opportunity to notify Buyer if such Seller disputes such withholding.

**Section 1.07    Set Off.** Buyer shall have the right to withhold and set off against any amounts otherwise due and payable by Buyer pursuant to Section 1.03(b) and pursuant to any applicable Note against any amount owed by the Sellers to Buyer or any Buyer Indemnified Party (as defined herein) pursuant to this Agreement or otherwise.  The Sellers and the Buyer each acknowledge that as of the date of this Agreement they know of no such amount owed by such Seller to Buyer or any Buyer Indemnified Party (as defined herein) pursuant to this Agreement or otherwise.

**Section 1.08    Companies Retain Certain Markets**. So long as John E. Renfroe is a member of either Company and employed either by the Company or by Buyer, Buyer shall not acquire, separate from one of the Companies, any billboard related assets within fifty (50) miles of any existing billboard assets of either Company (the "**Exclusive Territory**") without the prior consent of Jed Renfroe, such consent to be granted or declines in his sole discretion. Notwithstanding the foregoing, this restriction shall not apply to Buyer's acquisition of a portfolio of billboard-related assets located in multiple markets (whether by purchase of such assets or the equity of one or more companies owning such assets) which includes billboard-related assets within such Exclusive Territory provided that the majority of such billboard-related assets at the time of purchase are located outside such Exclusive Territory.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Each Seller represents and warrants to Buyer that the statements contained in this ARTICLE II are true and correct as of the Effective Date. For purposes of this ARTICLE II, "**Seller's knowledge**," "**knowledge of Seller**" and any similar phrases shall mean the actual or constructive knowledge of (in the case of Jed Renfroe and Christa Hurley) Seller or (in the case of JR Media and APE).any member, manager or officer of such JR Media and APE, after due enquiry. For purposes of this Agreement, "**Company-Level Representations**" shall mean the representations and warranties in Section 2.10 through Section 2.26 hereof.

**Section 2.02    Existence and Power.** Both JR Media and APE are limited liability companies duly organized, validly existing and in good standing under the laws of the State of Georgia and have all requisite limited liability company power and authority to execute and deliver this Agreement, consummate the transactions and perform each of their obligations contemplated hereby.

4828-5414-5273

**Section 2.03    Authority; Approvals.**

(a)    The execution and delivery of this Agreement by each of JR Media and APE, the consummation by JR Media and APE of each of the transactions and the performance by JR Media and APE of each of their obligations contemplated hereby have been duly and properly authorized by all necessary limited liability company action on the part of each such entity. This Agreement has been duly executed and delivered by each Seller, and, assuming the accuracy of the representations and warranties of the Buyer in ARTICLE III hereof, constitutes the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject, (i) as to enforceability, to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights and to general principles of equity (regardless of whether such enforceability is considered in proceeding in equity or at law) and (ii) to equitable principles of general applicability relating the availability of specific performance, injunctive relief, or other equitable remedies.

(b)    The execution and delivery of this Agreement by each Seller and the consummation of each of the transactions and the performance of each of the obligations contemplated hereby (i) after giving effect to the Company Resolutions (as defined herein), do not conflict with, violate or breach (whether with or without notice or lapse of time or both), require the consent of any Person or otherwise result in a material detriment to Seller under (A) its organizational documents, if applicable (including the applicable LLC Agreement), or (B) any agreement to which it is a party or by which its assets or property is bound or any law or order applicable to it, in the case of clause (B), which conflicts, violations, breaches or material detriments could reasonably be expected to prevent the consummation of any of the transactions contemplated hereby or have a material adverse effect on the business, properties or condition (financial or otherwise) of such Seller; and (ii) do not impose any penalty or other onerous condition on such Seller that could reasonably be expected to prevent the consummation of any of the transactions, contemplated hereby. As used in this Agreement, the term "**Person**" means a natural person, corporation, limited liability company, venture, partnership, trust, unincorporated organization, association or other entity.

(c)    No approval from any Governmental Entity is required with respect to any Seller in connection with the execution and delivery by such Seller of this Agreement, the performance by such Seller of its obligations hereunder or the consummation by such Seller of the transactions contemplated hereby, except for any such approval the failure of which to be made or obtained (i) has not impaired and could not reasonably be expected to impair the ability of such Seller to perform its obligations under this Agreement in any material respect, and (ii) could not reasonably be expected to delay, in any material respect, or prevent the consummation of any of the transactions contemplated by this Agreement. As used in this Agreement, the term "**Governmental Entity**" means any agency, bureau, commission, authority, department, official, political subdivision, tribunal or other instrumentality of any government, whether (i) regulatory, administrative or otherwise; (ii)

federal, state or local; or (iii) domestic or foreign.

**Section 2.04     Legal Proceedings.** No Seller has received notice of, and to such Seller's knowledge, there is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or threatened against or by such Seller (a) relating to or affecting the Purchased Units; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To each Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 2.05     Ownership of Purchased Units.**

(a)     Each Seller is the record and beneficial owner of the applicable Purchased Units, free and clear of any Encumbrance and any other limitation or restriction, other than any such Encumbrance, limitations or restrictions arising under the related LLC Agreement or applicable securities laws, with full right and authority to deliver the same hereunder, and will transfer and deliver to the Buyer on the Closing Date valid title to such Purchased Units free and clear of any Encumbrance and any such other limitation or restriction, other than any such liens, limitations or restrictions arising under such LLC Agreement or applicable securities laws. All amounts payable at any time by any and all Sellers for acquisition of the Owned Units have been paid in full.

(b)     Each of the applicable Purchased Units were issued in compliance with applicable laws, and were not issued in violation of the organizational documents of the related Company or any agreement, arrangement or commitment to which the applicable Seller is a party and are not subject to or in violation of any preemptive or similar rights of any Person.

(c)     No Seller holds any Membership Interests, Units or other equity interests or rights in either Company other than the Owned Units.

**Section 2.06     Access to Information.**     Each Seller has had access to information regarding the Companies and their respective present and prospective business, assets, liabilities and financial condition that such Seller has requested and/or considers important in making its decision to sell the applicable Purchased Units.

**Section 2.07     Independent Investigation**. Each Seller (a) has the requisite knowledge, sophistication and experience in order to fairly evaluate a disposition of the applicable Purchased Units, including the risks associated therewith, and (b) has adequate information and has made its own independent investigation and evaluation to the extent it deems necessary or appropriate concerning the properties, business, and financial condition of the applicable Company to make an informed decision regarding the transfer of the applicable Purchased Units pursuant to this Agreement.

**Section 2.08     Brokers.** Except for the engagement of Williamson & Associates by Renfroe Georgia, all negotiations relating to this Agreement and the transactions contemplated

4828-5414-5273

hereby have been carried out without the intervention of any Person acting on behalf of any Seller in such manner as to give rise to any valid claim against such Seller for any brokerage or finder's commission, fee or similar compensation.

**Section 2.09    Seller Taxes.** With respect to each Seller: (a) all tax returns (including information returns) required to be filed on or before the Closing Date by such Seller have been timely filed, (b) all such tax returns are true, complete and correct in all respects, (c) all taxes due and owing by such Seller (whether or not shown on any tax return) have been timely paid, (d) all deficiencies asserted, or assessments made, against such Seller as a result of any examinations by any taxing authority have been fully paid, (e) there are no pending or threatened actions by any taxing authority against such Seller, (f) there are no tax liens or encumbrances of any kind whatsoever on such Seller's Purchased Units, and (g) such Seller is not a foreign person as defined in Treasury Regulations Section 1.1446(f)-1(b)(4) or Section 1.1445-2.

**Section 2.10    Ownership and Control.** (a) Schedule 4 accurately lists the following as of date hereof (i) each Company's authorized capitalization, (ii) the number of issued and outstanding equity interests of such Company, each record and beneficial owner (and if not a natural person, the type of entity and jurisdiction of incorporation or organization of each such owner), each such owner's equity interests and percentage ownership interest in such Company, (iii) all outstanding rights to such Company's equity interests, (iv) all outstanding securities of such Company or other obligations of such Company that are convertible, exchangeable or exercisable into equity interests of such Company; and

(b)    Other than each LLC Agreement and any of the applicable Company's other organizational documents, there are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Owned Units or any of them.

(c)    Neither Company has at any time issued, granted or authorized (and there are no outstanding or promised) equity options, restricted equity awards, equity units, equity appreciation, phantom equity, deferred equity, performance equity, profits interests, profit participation, or other compensatory equity or equity-linked awards, or other equity or voting interests in such Company.

(d)    Neither Company has, nor has ever had, a subsidiary.

**Section 2.11    Taxes of the Companies**. With respect to each Company: (a) all tax returns (including information returns) required to be filed on or before the Closing Date by such Company have been timely filed, (b) all such tax returns are true, complete and correct in all respects, (c) all taxes due and owing by such Company (whether or not shown on any tax return) have been timely paid, (d) all deficiencies asserted, or assessments made, against such Company as a result of any examinations by any taxing authority have been fully paid and (e) there are no pending or threatened actions by any taxing authority against such Company. The Sellers shall pay for the preparation of a short-year tax return for each Company as of the Closing. The next tax return of each Company shall cover the period commencing on Closing and ending on the last day of the

10

calendar year 2021.

Section 2.12    **Financial Statements; Undisclosed Liabilities**. The financial statements of the Company ending August 31, 2021, December 31, 2020 and December 31, 2019 (the "**Financial Statements**") fairly and accurately reflect in all material respects the assets, liabilities, financial condition and results of operations of each Company for the period covered. No improper accounting practices have been used in the preparation or presentation of such Financial Statements for the purpose of not reflecting or incorrectly reflecting any properties, assets, liabilities, revenues or expenses. Neither Company has any liabilities other than liabilities reflected or reserved for on the Financial Statements. Neither Company has any indebtedness other than indebtedness that will be paid off at the Closing pursuant to the Payoff Letters.

Section 2.13    **Books and Records**. Each Company maintains accurate books and records that provide reasonable assurance that all material transactions to which such Company is a party or by which such Company's properties are bound, are recorded. True, complete and correct copies of such books and records and minute books (if any) of such Company have been made available or otherwise delivered to the Buyer.

Section 2.14    **No Adverse Change**. Between August 31, 2021 and the date of this Agreement: (a) the business of each Company has been conducted in all material respects in the ordinary course consistent with past practices; and (b) there has not occurred any event, change, circumstance or occurrence that had a material adverse effect on the assets, operations, or condition (financial or otherwise) of either Company or the value of the Purchased Units, or would reasonably be expected to prevent the consummation of the transactions contemplated by this Agreement by Sellers or either Company.

Section 2.15    **Title to and Sufficiency of Assets**.

(a)    Each Company has good and valid title to its assets, in each case free and clear of all Encumbrances. All amounts payable at any time by the Companies and by each Seller for acquisition of any Sites and Structures owned by the Companies as of Closing have been paid in full. Each Company's buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

(b)    Since September 1, 2018, no Structure has suffered any damage by fire or other casualty that has not heretofore been completely restored to its original condition.

(c)    Since September 1, 2018, neither Company has received any written notice from any insurance company that has issued a policy with respect to any Structures

11

requesting performance of any structural or other repairs or alterations thereto that have not been heretofore completed by such Company.

(d)     Except as contained within the Advertising Contracts or disclosed on Schedule 5 herein, no Person other than the Companies and their advertising customers has any right, title or interest in any of the printed advertising copy posted or to be posted on any Structure, to the extent owned by either Company and physically posted on the Structures owned by the Companies as of the Effective Date ("**Ad Copy**"). Following the Closing, each Company shall have the right to allow such Ad Copy to remain in place and to bill the respective customers in accordance with the existing or pending sales and advertising contracts associated with or relating to such Structures and such Ad Copy (and related artwork and vinyl production to the extent owned by such Seller).

**Section 2.16     Contracts; Revenues.**

(a)     Sellers have delivered or made accessible to Buyer true, correct and complete copies of, each contract pursuant to which a Company provides outdoor advertising products or services (the "**Advertising Contracts**"). Each such Advertising Contract (a) is a valid and binding agreement of such Company, (b) is in full force and effect and is enforceable against the such Company, and, to the knowledge of Sellers, the other parties thereto, (c) is assignable without the consent of the advertiser, (d) has been entered into in the ordinary course of business, at generally prevailing market rates, (e) does not allow or require the advertiser or agency party thereto to pay or provide other benefits to either Company, any Seller or their respective affiliates, (f) provides for consideration other than (and does not permit or require) barter or trades, and (g) was entered into on an arm's length basis, on market terms and market rates. Each Company has performed in all material respects the obligations required to be performed by such Company prior to the date of this Agreement under each such Advertising Contract. All material obligations of Seller and advertiser pertaining to the Advertising Contracts and required to be performed prior to the Closing Date have been performed. No Advertising Contract can be cancelled by the advertiser on less than sixty (60) days notice where the remaining amount to be accrued would exceed $10,000. No event has occurred that, with notice or lapse of time or both, would constitute a default, violation or breach under the terms of any such Advertising Contract by the applicable Company or, to the knowledge of Sellers, any other party thereto. Neither Company has been notified in writing, nor does any Seller have any knowledge, that any counterparty to any such Advertising Contract: (i) intends to not renew their Advertising Contract upon its expiration, (ii) intends to cease doing business with the applicable Company, or (iii) intends to materially reduce the amount of the business it is presently doing with such Company. Complete and correct copies of each such Advertising Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer. The historical net revenue information provided to Buyer from Sellers with respect to the Advertising Contracts are accurately represented in the due diligence materials provided by Sellers to Buyer.

12

(b)    Schedule 5 lists each of the material contracts or agreements, written or oral, with any party affecting this Agreement, the business of either Company, or the assets of either Company other than the Advertising Contracts (such contracts, the "**Other Contracts**" and together with the Advertising Contracts, the "**Company Contracts**"). Each such Other Contract (a) is a valid and binding agreement of such Company or other related party, and (b) is in full force and effect and is enforceable against such Company or other related party, and, to the knowledge of Sellers, any other parties thereto,

(c)    Other than the Leases (as defined herein), the Advertising Contracts and the Other Contracts, neither Company has any other material contracts or agreements, written or oral, with any party affecting this Agreement, the business of either Company, or the assets of either Company.

**Section 2.17    Panels; Structures.**  The Structures owned by each Company include 318 billboard faces on 69 Structures, which numbers do not include the 7-digital package of Sites located in Charleston, South Carolina set forth on Schedule 3 hereto identified as the "SC 7-Digital Package" (the "**Panels**"), all of which are available in good condition, acceptable by the standards of the outdoor advertising industry as of the time of construction.

**Section 2.18    Interests in Customers, Suppliers and Competitors.** Except as disclosed on Schedule 1 hereto, no Seller Party, nor any former or existing owner, manager, director, board member nor any spouse or family member of any of the foregoing:

(a)    except with respect to the BeSeen Group as permitted herein, owns or has any interest of any nature in any outdoor advertising site used by Sellers for the Structures owned by the Companies;

(b)    except with respect to the BeSeen Group as permitted herein, owns or has any interest of any nature in any real estate used by any competitor of Seller in the Area for outdoor advertising purposes;

(c)    except with respect to the BeSeen Group as permitted herein, owns any direct or indirect interest:

(i)    in any competitor or supplier of either Company in the Territory (defined herein); or

(ii)    in any Person from whom Seller or any other Person leases sites for outdoor advertising displays in the Territory.

**Section 2.19    Litigation; Legal Proceedings.**  Neither Company has received notice and, to each Seller's knowledge, there is no Action of any nature pending or threatened against or by either Company relating to or affecting the assets of such Company. To each Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

13

**Section 2.20    Compliance with Laws**.  Neither Company is in violation of any applicable law, regulation or ordinance relating to its assets or the conduct of its business including any zoning or outdoor advertising regulatory law or regulation.  Neither Company has not received any written notice or communication alleging or investigating any non-compliance with any applicable law, regulation or ordinance.

**Section 2.21    Permits**.  Each Company has each material permit, authorization, consent, waiver, closure or exemption, necessary to operate the business of such Company as currently conducted, and such Company is in compliance in all material respects with the same.  There are no proceedings pending or, to the knowledge of any Seller, threatened, which may result in the revocation, termination, cancellation, or suspension or any such permit, authorization, consent, waiver, closure or exemption.

**Section 2.22    Insurance**.  Each Company maintains in full force and effect policies of general liability insurance covering the assets of such Company and the operation thereof, of the types and with the amounts of coverage as a reasonable operator in the outdoor advertising businesses would maintain.

**Section 2.23    Labor Relations**.

(a)    Schedule 6 contains a true and correct list of all of all employees of each Company as of the date of this Agreement, including date of employment, job title and hourly wage or salary.

(b)    Each Company has properly classified, in accordance with applicable law, all of its current officers, employees, directors, managers, independent contractors and consultants ("**Service Providers**"), as applicable, (i) as independent contractors or employees, (ii) as exempt or nonexempt, and (iii) as employed or self-employed, in each case, for all purposes and has made all appropriate filings in connection with the services provided by, and compensation paid to, such Service Providers.  Each Company has paid in full to all of its Service Providers, and is not delinquent in any payments to, or on behalf of, any current or former Service Provider for any services or amounts required to be reimbursed or otherwise paid, and there is no claim with respect to payment of wages, salary or overtime pay that has been asserted or is now pending or, to each Seller's knowledge, threatened before any Governmental Entity with respect to any Service Providers.

(c)    Neither Company is a party to any union agreement or collective bargaining agreement with respect to any such employee. To each Seller's knowledge there are no union organization campaigns in progress with respect to any such employees with regard to their employment with the applicable Company.

**Section 2.24    Employee Plans**.  Schedule 7 contains lists all material Benefit Plans relating to the employees of each Company. Each Company has complied in all material respects with all applicable laws governing each Benefit Plan. No lawsuits or, to each Seller's knowledge,

14

written complaints to, or by, any Person, are pending with respect to any Benefit Plan. Neither Company has any liability to any plan participant, beneficiary or other Person under any provision of ERISA or any other applicable law resulting from any failure by such Company to (i) pay any benefits or other amounts which are due and owning thereto under a Benefit Plan, or (ii) give credit which is due for any benefits or rights (such as, but not limited to, vesting rights) with respect to benefits under or in connection with any Benefit Plan. Neither Company is in arrears with respect to any contributions under any Benefit Plan. Neither Company is a participating employer in a multi-employer plan (as defined in Section 3(37) of ERISA) with respect to any employees of such Company. Each Company is in material compliance with the requirements of Section 4980B of the Code and Section 601 of ERISA. As used in this Agreement "**Benefit Plan**" means (x) each employee benefit plan (as defined in Section 3(3) of ERISA, whether or not subject to ERISA) and (y) each other employee benefit plan, arrangement, program, policy or agreement, obligation, custom or practice, whether or not written, that provides for, establishes or memorializes the terms of any of the following: employment, individual consulting, service, severance, stay or retention payments, transaction, change in control, bonus, incentive compensation, sick leave, vacation pay, paid-time-off, plant closing benefits, patent award programs, salary continuation, disability, workers' compensation, retirement, supplemental retirement, post-employment (including retiree medical and retiree life), deferred compensation, compensatory or incentive equity or equity-linked awards, pension, profit-sharing, hospitalization, medical insurance, dental and/or vision insurance, life insurance, tuition reimbursement or scholarship programs, employee discount programs, meals, travel, or vehicle allowances, holiday pay, housing assistance, moving expense reimbursement, fringe benefits or any other compensation benefits or perquisites, in any case, that is maintained, sponsored or contributed to by either Company or any ERISA Affiliate thereof or with respect to which such Company or such ERISA Affiliate thereof has any obligation or liability, whether actual or contingent, direct or indirect, to provide compensation and/or benefits to or for the benefit of any current or former Service Provider (or spouse, dependent or beneficiary thereof), other than any statutory pan to which contributions are mandated by a Governmental Entity. As used herein "**ERISA Affiliate**" with respect to either Company shall mean any trade or business that, together with such Company, would be required to be treated as a "single employer" under ERISA Section 4001(b)(1) or Code Sections 414(b), (c), (m), or (o).

**Section 2.25    Environmental.**

(a)    Each Company is in compliance in all material respects with all Environmental Laws. Neither Company has received from any Person any: (i) environmental notice or environmental claim; or (ii) written request for information in connection with an allegation of potential liability under Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements of such Company.

(b)    Each Company has obtained and is in material compliance with all permits, authorizations, consents, waivers, closures or exemptions in respect of Environmental Laws (each an "**Environmental Permit**") necessary for the ownership, lease, operation or use of the properties and assets of the business of such Company and such Environmental

4828-5414-5273

Permits are in full force and effect and shall be maintained in full force and effect by such Company through the Closing Date in accordance with Environmental Laws, and there is no condition, event or circumstance that is likely to prevent or impede, after the Closing Date, the ownership, lease, operation or use of the properties and assets of the business of such Company by Buyer as currently carried out.

(c)     No real property currently or formerly owned, operated or leased by either Company is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)     The Sellers have not retained or assumed, by contract or operation of law, any liabilities or obligations of third parties under Environmental Law, other than any liability arising from a Company's actions.

(e)     As used herein, "**Environmental Laws**" means any applicable law, regulation or ordinance or binding agreement with any Governmental Entity relating to pollution (or the cleanup thereof) or the protection of endangered or threatened species, human health or safety as they relate to the exposure to Hazardous Materials, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata). The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): (a) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; (b) the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; (c) the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; (d) the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; (e) the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; (f) the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and (g) the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq. As used herein, "**Hazardous Material**" means (x) any petrochemical or petroleum product, petroleum, including crude oil or any fraction thereof, radioactive material, asbestos or asbestos-containing materials in any form, and radon gas, (y) any chemicals, materials or substances defined by an Environmental Law as or included in the definition of "hazardous pollutant," "toxic pollutant," "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants" or "pollutants" or words of similar meaning and regulatory effect, or (z) any other chemical, material or substance, exposure to which is prohibited, limited, or regulated by any applicable Environmental Law.

**Section 2.26     Real Property.**

(a)     <u>Schedule 8</u> identifies for each Company the fee title real property owned by each Company ("**Fee Real Property**"), all easements to real property owned by each

16

Company ("**Easements**") and all leasehold interests in real property held by each Company ("**Leased Real Property**") pursuant to written leases ("**Leases**"), in each case, used in the conduct and operation of the business of the Companies (the "**Real Property**"), each identified on such Schedule as either "Fee Real Property", "Easements" or "Leased Real Property", as applicable. Each Company owns the applicable Fee Real Property free and clear of all Encumbrances other than (x) liens that would be identified or disclosed by a title commitment or ALTA/NSPS Land Title Survey, (y) mechanics', carriers', workmen's, repairmen's or other like Lien arising or incurred in the ordinary course of business, and (z) any zoning or other land use applicable laws, regulations or ordinances regulating the use or occupancy of real property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such real property and that are not violated by the current use or occupancy of such real property or such Company's operations. There are no outstanding options, rights of first offer, or rights of first refusal to purchase the Real Property. There is no pending or, to the knowledge of any Seller, threatened condemnation or eminent domain proceeding against any portion of the Real Property.

(b)     Prior to the date of this Agreement, Sellers have provided or made accessible for Buyer copies of all Easements and Leases with respect to the Real Property. Each such Easement and Lease is a valid and binding agreement of the applicable Company, is in full force and effect and is enforceable against such Company and, to the knowledge of Sellers, any other parties thereto. Each Company has performed in all material respects the obligations required to be performed by it prior to the date of this Agreement under each such Easement and Lease. No event has occurred that, with notice or lapse of time or both, would constitute a default, violation or breach under the terms of any such Easement or Lease by the applicable Company or, to the knowledge of Sellers, any other party thereto. Neither Company has received any written notice of termination for any such Easement or Lease.

(c)     Neither Company nor any Seller has received a no-take-down order from any Governmental Entity or notice from any landowner of intent to terminate or not renew any Lease. There are no Panels or Structures owned by either Company that encroach on any property, public or private, except with respect to title matters related to the 131 Spruill Avenue Site, the details of which have been discussed with Buyer. Pursuant to the Leases or other applicable agreements or documents, each Company has, and after the Closing will have, continuous and uninterrupted access to all of the applicable Structures. The historical Lease expense information is accurately represented in the due diligence materials provided by Sellers to Buyer. Neither Company nor any Seller has been notified, nor to any Seller's knowledge whatsoever, that any lessor under any Lease: (x) intends to not renew their Lease upon its expiration, or (y) intends to cease doing business with the applicable Company.

(d)     Neither Company has received any written notice of (i) violations of building codes, Legal Requirements, Environmental Laws and/or zoning ordinances or

other governmental or regulatory laws affecting the Real Property which remain uncured, (ii) existing, pending or threatened condemnation Actions affecting the Real Property, (iii) existing, pending or threatened zoning, environmental, building code or other moratorium Actions, or similar matters which could reasonably be expected to adversely affect the ability to operate the Real Property as currently operated, (iv) any restrictions, covenants or Encumbrances of record with respect to the Real Property, or (v) all agreements, contracts, insurance policies (including, without limitation, to the extent necessary to prevent cancellation thereof and to insure full payment of any claims made under such policies), agreements and conditions applicable to the Real Property or the ownership, operation, use or possession thereof. For purposes hereof, the term "**Legal Requirements**" shall mean all applicable statutes, regulations, rules, ordinances, codes, licenses, permits, orders and approvals of each Governmental Entity having jurisdiction over the Real Property, including, without limitation, all health, building, fire, safety and other codes, ordinances and requirements, the Americans With Disabilities Act of 1990, and any judicial or administrative interpretation thereof, including any judicial order, consent, decree or judgment applicable to the Real Property or each Seller.

(e)     Neither Company has received written notice that any amounts, including, without limitation, any municipal property taxes, local improvement taxes, levies or assessments, are owing by such Company in respect of the Real Property to any Governmental Entity or public utility, other than current accounts that are not delinquent. Neither Company has initiated any appeals on assessments which have been issued or raised by any Governmental Entity or concerning any realty, business or other taxes with respect to the Real Property which remain outstanding.

**Section 2.27     Full Disclosure.** No representation or warranty by a Seller in this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**Section 2.28     Supplement to Schedules**. From time to time prior to Closing, Sellers shall have the right to supplement or amend the Schedules hereto with respect to any matter hereafter arising or of which Sellers become aware after the date hereof (each a "**Schedule Supplement**"). Each such Schedule Supplement shall be deemed to be incorporated into and to supplement and amend the Schedules as of the Closing Date.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Sellers that the statements contained in this ARTICLE III are true and correct as of the Effective Date. For purposes of this ARTICLE III, "**Buyer's**

18

**knowledge**," "**knowledge of Buyer**" and any similar phrases shall mean the actual or constructive knowledge of any manager or officer of Buyer, after due enquiry.

**Section 3.02    Existence and Power.** Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Arizona and has all requisite limited liability company power and authority to execute and deliver this Agreement, consummate the transactions and perform each of its obligations contemplated hereby.

**Section 3.03    Authority; Approvals.**

(a)    The execution and delivery of this Agreement by Buyer, the consummation by Buyer of each of the transactions and the performance by Buyer of each of its obligations contemplated hereby have been duly and properly authorized by all necessary limited liability company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, assuming the accuracy of the representations and warranties of each Seller in ARTICLE II hereof, constitutes the valid and legally binding obligation of Buyer, enforceable against it in accordance with its terms, subject, (i) as to enforceability, to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights and to general principles of equity (regardless of whether such enforceability is considered in proceeding in equity or at law) and (ii) to equitable principles of general applicability relating the availability of specific performance, injunctive relief, or other equitable remedies.

(b)    The execution and delivery of this Agreement by Buyer and the consummation of each of the transactions and the performance of each of the obligations contemplated hereby (i) do not conflict with, violate or breach (whether with or without notice or lapse of time or both), require the consent of any Person to or otherwise result in a material detriment to Buyer under, (A) its limited liability company or formation documents or (B) any agreement to which it is a party or by which its assets or property is bound or any law or order applicable to it, in the case of clause (B), which conflicts, violations, breaches or material detriments could reasonably be expected to prevent the consummation of any of the transactions contemplated hereby or have a material adverse effect on the business, properties or condition (financial or otherwise) of Buyer; and (ii) do not impose any penalty or other onerous condition on Buyer that could reasonably be expected to prevent the consummation of any of the transactions contemplated hereby.

(c)    No approval from any Governmental Entity is required with respect to Buyer in connection with the execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder or the consummation by Buyer of the transactions contemplated hereby.

**Section 3.04    Investment Intent**. Buyer is acquiring the Purchased Units solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Buyer acknowledges that the Purchased Units are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Purchased

19

Units may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.

**Section 3.05     Brokers.** All negotiations relating to this Agreement and the transactions contemplated hereby have been carried out without the intervention of any Person acting on behalf of Buyer in such manner as to give rise to any valid claim against the Buyer for any brokerage or finder's commission, fee or similar compensation.

**Section 3.06     Legal Proceedings**. There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer (a) relating to or affecting the Purchased Units; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 3.07     Independent Investigation**. Buyer has conducted its own independent investigation, review and analysis of the business, results of operations, condition (financial or otherwise) or assets of the Companies, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Sellers and the Companies for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in Article II of this Agreement (including the related portions of the Disclosure Schedules); and (b) none of the Sellers, the Companies or any other Person has made any representation or warranty as to the Sellers, the Companies or this Agreement, except as expressly set forth in Article II of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE IV
## NON-COMPETE; NON-SOLICITATION

**Section 4.01     Non-Compete Definitions**. For purposes of the covenants set forth in this Agreement, the terms listed below shall have the following meanings:

(a)     "**BeSeen Group**" shall mean Ben Jones and each of BeSeen Media Group, LLC, a Georgia limited liability company, and BeSeen Outdoor, Inc., a Georgia corporation.

(b)     "**Change in Control**" shall mean with respect to the Companies, after the Closing Date, the date upon which either of the following events occur: (i) the owners of the Companies immediately after the Closing Date (that being Buyer and Jed Renfroe), or trusts and beneficiaries of the estate of any direct or indirect owner thereof) shall cease to own and control, directly or indirectly, at least 51% of the outstanding equity interests of both Companies; or (ii) the sale of all or substantially all of the assets of the Companies.

20

(c) "**Non-Compete Party**" shall mean each Seller Party for itself and each such Seller Party on behalf of any other entity related thereto or affiliated with such Seller Party.

(d) "**Territory**" shall mean within any county in which either Company currently operates.

(e) "**Time Period**" means the earlier to come to an end of (i) the period beginning as of the date of a Change of Control and ending the date which is thirty-six (36) months after a Change in Control and (ii) the period beginning as of the first date on which a Seller (or its related Owner) ceases to own directly or indirectly any Owned Units and ending ten (10) years thereafter; provided, however, that if (and only if) required by a court's decision or order in order for the provisions of this ARTICLE IV to remain valid and enforceable against the Non-Compete Parties, "Time Period" shall mean the period beginning as of the Effective Date of this Agreement and ending at the greatest of nine (9), eight (8), seven (7), six (6), five (5), four (4), three (3), two (2) or one (1) year(s) thereafter. Notwithstanding the foregoing, the Time Period shall be extended as to any Non-Compete Party for the period of time in which such Non-Compete Party is in default or breach of its covenant under this ARTICLE IV.

Section 4.02    **Reliance**.  Each Non-Compete Party agrees that Buyer is relying upon this ARTICLE IV in entering into this Agreement and would not enter into this Agreement in the absence of the terms and conditions set forth in this ARTICLE IV.  Each Non-Compete Party acknowledges and agrees that the consummation of the transactions contemplated by this Agreement and benefits to be received therefrom are additional consideration for the execution and delivery of this Agreement by such Non-Compete Party.

Section 4.03    **Covenant Not to Compete**.  Each Non-Compete Party covenants and agrees with Buyer that, during the Time Period, such Non-Compete Party shall not, directly or indirectly, individually or as a shareholder, partner, member, financier, agent, employee, representative or consultant for or otherwise on behalf of or in conjunction with any individual, partnership, corporation, limited liability company or other entity not (a) construct, acquire, own, operate or manage outdoor advertising structures for outdoor advertising products or services in the Territory, (b) solicit any landlords or customers of either Company to terminate relationships with such Company, or (c) solicit any employees of either Company to leave employment from such Company ("**Restrictive Covenants**"); *provided* that it is expressly understood and agreed that BeSeen Group shall not be restricted pursuant to subsection (a) of this Section 4.04 (x) in the Bryan, Glynn and McIntosh Counties of Georgia or (y) from serving as a developer who shall procure Sites and billboards in Chatham and Bulloch Counties, Georgia, solely for the benefit of the Companies and not any member of the BeSeen Group.  In addition and notwithstanding the Restrictive Covenants, no member of the BeSeen Group shall be prohibited from the solicitation of any customers within any market, including but not limited to the Territory, and regardless of geography, for the purpose of pursuing agreements with advertisers for use of outdoor advertising structures belonging to and operated by any entity in the BeSeen Group. In addition and notwithstanding the Restrictive Covenants, each Non-Compete Party may acquire and own fee

21

title or perpetual easements to one or more parcels of land in the Territory and may lease such parcels of land to an operator of outdoor advertising structures constructed on such parcels of land, provided that (1) the Non-Compete Party does not own or operate the outdoor advertising structures on such parcels of land; and (2) the Non-Compete Party first offers to lease such parcels of land to the Buyer and the Buyer first rejects such offer to lease.

**Section 4.04    Enforceability**.  The Non-Compete Party represents and warrants to and covenants with Buyer as follows:

(a)    The covenants and restrictions in this Agreement are reasonably necessary for the protection of the interests of Buyer and its affiliates, are reasonable as to duration, scope and territory, and are not unreasonably restrictive of the Non-Compete Parties.

(b)    Each Non-Compete Party has carefully read and considered the provisions of this Agreement and, having done so, agrees that the covenants and restrictions set forth in this Agreement (including the Time Period, Territory, and scope of activity to be restrained) are fair and reasonable and are reasonably required for the protection of the interests of Buyer and its affiliates and their respective officers, directors, employees, creditors and shareholders.  Each Non-Compete Party understands that the covenants and restrictions contained in this Agreement may limit its ability to engage in a business similar to the Business, but acknowledges that it has received sufficiently high consideration upon the consummation of and during the Time Period to justify such covenants and restrictions.

(c)    Each Non-Compete Party agrees that if any Non-Compete Party breaches any covenants and restrictions set forth in this Agreement, such breach would cause irreparable harm to Buyer and its affiliates and the would sustain damages which would be difficult to calculate.  In the event of such breach, Buyer and its affiliates shall be entitled, in addition to monetary damages and to any other remedies available to them under this Agreement and at law, to equitable relief, including injunctive relief, without the necessity of posting a bond or proving irreparable harm.

(d)    Notwithstanding subsection (a), should any court of competent jurisdiction determine that any covenants and restrictions in this Agreement are unreasonable as to duration, scope, or territory, such court shall have the authority to make an equitable adjustment to such provision with the view to effecting, to the greatest extent possible, the original purpose and intent of this Agreement, including the maximum durational, geographic restricted activity scope and other limitations permitted by applicable law.  In any event, the validity and enforceability of the remaining provisions of this Agreement shall not be affected by any amendment contemplated by or made pursuant to this subsection.

4828-5414-5273

# ARTICLE V
## CONDITIONS TO CLOSING; ADDITIONAL COVENANTS

**Section 5.01    Conduct of Business by Companies**.  Except in connection with the provisions of this Agreement, from the Effective Date until the Closing, unless the Buyer otherwise agrees in writing, each Company will, and each Seller Party will cause each Company to, (a) conduct its businesses and operations in the ordinary course of business, (b) preserve substantially intact its existence and business organization, (c) use its commercially reasonable efforts to preserve the goodwill and present business relationships (contractual or otherwise) with all material customers, suppliers, resellers, employees, licensors, distributors and others having business relationships with it, (d) use its commercially reasonable efforts to keep available the services of its Service Providers, (e) use its commercially reasonable efforts to preserve in all material respects its present properties and its tangible and intangible assets, (f) comply in all material respects with all applicable laws, regulations or ordinances and Company Contracts, (g) pay all applicable taxes as such taxes become due and payable, and (h) maintain all existing licenses and permits applicable to its operations and businesses.  Without limiting the foregoing, and as an extension thereof, except as expressly permitted by any other provision of this Agreement, neither Company will, and no Seller Party will cause either Company to, from the Effective Date until the Closing, directly or indirectly, do, or agree to do, except in the ordinary course of business, any of the following without the prior written consent of the Buyer:

(a)    except with respect to the transfer of particular real property assets to Buyer by a companion purchase agreement and the reduction of the cash accounts of the Companies prior to Closing, sell, lease, license (as licensor), assign, dispose of or transfer any of its assets (whether tangible or intangible), except in the ordinary course of business;

(b)    mortgage, pledge or subject to any Encumbrance any portion of its properties or assets;

(c)    make, commit to make or authorize any capital expenditure, except in the ordinary course of business and in an aggregate amount not to exceed $10,000.00

(d)    acquire (including by merger, consolidation, license or sublicense) any interest in any Person or substantial portion of the assets or business of any Person;

(e)    incur any indebtedness or assume, guarantee or endorse the obligations or enter into any "keepwell" or other agreements to maintain the fiscal condition of any Person;

(f)    enter into, amend, modify, accelerate or terminate any Company Contract, except in the ordinary course of business; provided, however, that the Buyer shall be given reasonable advance notice of any such action;

4828-5414-5273

(g)     issue, sell, pledge, dispose of, encumber or transfer any equity securities, securities convertible, exchangeable or exercisable into equity securities, or warrants, options or other rights to acquire equity securities, of either Company;

(h)     declare, set aside, or distribute any dividend or other distribution (whether payable in cash, stock, property or a combination thereof), or enter into any agreement with respect to the voting of its capital stock (or other equity securities);

(i)     reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its capital stock (or other equity securities);

(j)     waive, release, assign, settle or compromise any material rights or claims, or any material litigation or arbitration;

(k)     disclose any trade secrets or other proprietary and confidential information to any Person that is not subject to any confidentiality or non-disclosure agreement;

(l)     (i) materially increase or commit to increase (whether orally or in writing) any form of compensation or benefits payable or to become payable to any Service Provider; (ii) grant or increase any rights to change in control, severance or termination payments or benefits, or incentive, performance or any other compensation or benefits to, or enter into any employment, consulting or severance agreement with, any Service Provider; (iii) accelerate the vesting, funding or payment of any compensation or benefits payable to any Service Provider; (iv) hire or engage or terminate any Service Provider; or (v) establish, adopt, enter into, amend, modify or terminate any Benefit Plan;

(m)     make loans or advances to, guarantees for the benefit of, or any investments in, any Person;

(n)     forgive any loan to any Service Provider or any affiliate thereof;

(o)     make any change in accounting policies, practices, principles, methods or procedures, other than as required by United States generally applicable accounting principles consistently applied or by a Governmental Entity;

(p)     (i) accelerate or delay collection of notes or accounts receivable in advance of or beyond their regular due dates or the dates when the same would have been collected in the ordinary course of business; (ii) delay or accelerate payment of any account payable in advance of its due date or the date such liability would have been paid in the ordinary course of business; (iii) make any changes to cash management policies; (iv) delay or postpone the repair or maintenance of their properties; or (v) vary any inventory purchase practices in any material respect from past practices;

(q)     write up, write down or write off the book value of any assets of either Company, except for depreciation and amortization in accordance with United States generally applicable accounting principles consistently applied;

(r)     (i) make any new, changed or rescinded any tax election; (ii) enter into a settlement or compromise of any claim, notice, audit report or assessment in respect of any taxes; (iii) change any annual tax accounting period; (iv) adopt or change any method of tax accounting, (v) file any amended tax return; (vi) enter into any tax allocation agreement, tax sharing agreement or closing agreement relating to any tax; (vii) surrender any right to claim a tax refund or (viii) consent to any extension or waiver of the statute of limitations period applicable to any tax claim or assessment;

(s)     take any action for the winding up, liquidation, dissolution or reorganization of either Company or for the appointment of a receiver, administrator or administrative receiver, trustee or similar officer of its assets or revenues;

(t)     enter into any collective bargaining agreement or similar labor union or employee representative organization contract;

(u)     layoff or terminate employees that could result in a material liability under the Worker Adjustment and Retraining Notification Act;

(v)     elect to defer any taxes payable by either Company under the Coronavirus Aid, Relief, and Economic Security Act;

(w)     fail to keep in force insurance policies or replacement or revised provisions providing insurance coverage with respect to the assets, operations and activities of each Company as are currently in effect;

(x)     take or omit to take any action that which, individually or in the aggregate, could reasonably be expected to result in any representation or warranty of either Company or any Seller to be untrue, result in a breach of any covenant made by either Company or any Seller Parties in this Agreement or could reasonably be expected to result in any condition set forth in Section 5.02(a)(i) not being satisfied;

(y)     materially expand the nature or scope of its business, including with respect countries, sales practices, distributors, agents and countries;

(z)     cancel any indebtedness owed to a Company or waive any claims or rights of value, except in the ordinary course of business; or

(aa)     agree or commit to do any of the foregoing.

**Section 5.02     Closing Conditions**

(a)     **Conditions to Obligation of the Buyer.**

(i)     Each of the representations and warranties of the Companies and the Sellers contained herein shall be true and correct in all material respects on and as of the Effective Date and on and as of the Closing (except to the extent such representations and warranties address matters as of particular dates, in which case, such representations and warranties shall be true and correct in all material respects on and as of such dates) and, except for the representations and warranties that are naturally invalidated by the consummation of the transaction contemplated by this Agreement, such representations and warranties shall be true and correct in all material respects after giving effect to the consummation of the transactions contemplated by this Agreement.

(ii)     The Companies and the Sellers shall have performed and complied in all material respects with all of their covenants and agreements required to be performed by them pursuant to this Agreement prior to the Closing Date.

(iii)     Since the Effective Date, there shall occurred any event, change, circumstance or occurrence that had a material adverse effect on the assets, operations, or condition (financial or otherwise) of either Company or the value of the Purchased Units, or would reasonably be expected to prevent the consummation of the transactions contemplated by this Agreement by Sellers or either Company.

(iv)     Sellers shall have delivered, or cause to be delivered, to Buyer all of the following:

(A)     The membership interest transfer powers, each in the form attached hereto as Exhibit D with respect to each of the applicable Purchased Units (collectively, the "**Transfer Powers**"), duly executed by the applicable Seller;

(B)     payoff letters in form and substance satisfactory to Buyer with respect to all funded indebtedness of each Company including, if applicable, lien releases relating to the assets and property of the applicable Company (each a "**Payoff Letter**");

(C)     With respect to JR Media and APE, a certificate of the Secretary (or equivalent authorized officer) of each Seller certifying as to the resolutions or unanimous written consent of the governing body or Person of such Seller, as applicable, duly adopted and in effect, which authorizes and approves this Agreement and the performance by such Seller of its obligations under this Agreement and the transactions contemplated hereby;

(D)     Reserved.

26

(E)     A properly completed and duly executed IRS Form W-9 from each of Jed Renfroe, Christa Hurley, and the individual Members of JR Media and APE;

(F)     To each Company and to Buyer, an executed copy of each Amended and Restated LLC Agreement in a form to be agreed upon in good faith between Buyer and Jed Renfroe prior to the Closing; and

(G)     Such other documents relating to the transactions contemplated by this Agreement as the Company or Buyer may reasonably request. The Buyer shall notify Seller in writing of any such other documents at least five (5) days before Closing, or this requirement shall be deemed waived.

(v)     each Company shall have delivered or made available to Buyer, the following:

(A)     an executed copy of each Amended and Restated LLC Agreement described in Section 5.02(a)(iv)(F) (the "**Amended and Restated LLC Agreements**")

(B)     the Payoff Letters;

(C)     A certificate of the Secretary (or equivalent authorized officer) of such Company certifying as to the resolutions or unanimous written consent of the members and Managers of such Company, duly adopted and in effect (with respect to each Company, the "**Company Resolutions**"), which authorizes and approves this Agreement, the applicable Transfer Powers, such Company making an election contemplated in Code Section 754 and the Treasury Regulations promulgated thereunder in accordance with Section 6.05, and the performance by such Company of its obligations under this Agreement and the transactions contemplated hereby; and

(D)     Evidence of payment of all expenses, obligations and liabilities of the Company accrued prior to Closing, including without limitation, the following items prorated as of the Closing: (aa) rents payable under Leases, including percentage rents; (bb) permit fees, property taxes, utilities service charges and insurance premiums; (cc) sales commissions, payroll expenses, production costs and Company Contract charges; (dd) all other costs of goods sold and corporate operating expenses (collectively, the "**Prorations**")

(b)     **Conditions to Obligation of Each Seller.**

(i)     Each of the representations and warranties of the Buyer contained herein shall be true and correct in all material respects on and as of the Effective Date and on and as of the Closing.

(ii)    Conditioned upon receipt of the deliveries of the Sellers and the Company set forth in this ARTICLE V, Buyer shall have delivered, or cause to have been delivered, to the Seller and the Companies, as applicable, the following:

(A)     To the Sellers, the Closing Cash Payment;

(B)     To Jed Renfroe, Christa Hurley and JR Media, the Notes;

(C)     To the Companies and the Sellers, a certificate of the Secretary (or equivalent authorized officer) of the Buyer certifying as to the unanimous written consent of the manager of the Buyer duly adopted and in effect, which authorizes and approves this Agreement and the performance by the Buyer of its obligations under this Agreement and the transactions contemplated hereby; and

(D)     To each Company and the Sellers, an executed copy of Buyer's LLC Agreement.

(iii)   Each Company shall have delivered, or cause to have been delivered, to each Seller, the following:

(A)     an executed copy of each Amended and Restated LLC Agreement;

(B)     A certificate of the Secretary (or equivalent authorized officer) of such Company certifying as to the Company Resolutions.

**Section 5.03     Additional Covenants.**

(a)     **No Solicitation of Other Bids**.

(i)     No Seller Party shall, directly or indirectly, (1) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (2) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; (3) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal or (4) authorize or permit any of its affiliates or any of its representatives to do the same. Each Seller Party shall immediately cease and cause to be terminated, and shall cause its affiliates and all of its and their representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal.

28

For purposes hereof, "**Acquisition Proposal**" means any inquiry, proposal or offer from any Person (other than Buyer or any of its affiliates) relating to the direct or indirect disposition, whether by asset sale, equity sale, merger or otherwise, of all or any portion of the business of the Company or the an interest therein.

(ii)     In addition to the other obligations under this Section, each Seller Party shall promptly (and in any event within three (3) days after receipt thereof by such Seller Party or its representatives) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same

(iii)     Each Seller Party agrees that the rights and remedies for noncompliance with this Section shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

(b)     **Confidentiality**.

(ii)     Each Seller Party agrees that each such Person shall not, and that such Person shall cause its affiliates and its representatives not to, at any time on or after the Closing Date, directly or indirectly, without the prior written consent of the Buyer, disclose or use any Confidential Information or information with respect to the legal, financial or other terms or conditions of this Agreement or any of the transactions contemplated hereby.  If a party or any of its respective affiliates become legally compelled to make any disclosure that is prohibited or otherwise restricted by this Agreement, then that party will (i) give the other party prompt written notice of such requirement and (ii) consult with and assist the other party, at the other party's expense, in obtaining an injunction or other appropriate remedy to prevent such disclosure.  Subject to the previous sentence, the disclosing party or its representatives may make only such disclosure that, on the advice of its counsel, it is legally compelled or otherwise required to make.

(iii)     Each Seller Party further agrees that (i) prior to the Closing, it shall use all reasonable care to safeguard Confidential Information and to protect it against disclosure, misuse, loss and theft; and (ii) promptly after the Closing, such Seller Party shall deliver to the applicable Company or destroy all information and other intellectual property of such Company in such party's possession and control, in whatever form or medium.  If the Buyer requests, each Seller Party shall promptly provide written confirmation and certification that such party has returned or destroyed all such materials.

29

(iv)     As used herein "**Confidential Information**" means all information (whether or not specifically identified as confidential), in any form or medium, that is disclosed to, or developed or learned by, either Company or a Seller Party as a direct or indirect owner of equity in a Company, as the case may be, in the performance of duties for, or on behalf of, a Company or that relates to the business, products, services or research of a Company or any of their investors, partners, affiliates, strategic alliance participants, officers, directors, employees or stockholders or their respective affiliates; *provided that* "Confidential Information" shall not include any information that (x) has become generally known to and widely available for use within the industry other than as a result of the acts or omissions of the Seller Parties or a Person that the Seller Parties have direct control over to the extent such acts or omissions are not authorized by the Seller Parties in the performance of such Person's assigned duties for the Seller Parties, or (y) items developed without reference to the Confidential Information of the Companies.

(c)     **Press Releases**.  No party, whether directly or indirectly, may issue any press release or announcement relating to any aspect of this Agreement or the transactions contemplated by this Agreement without Buyer's prior, written approval.

## ARTICLE VI
## TAX MATTERS; DISTRIBUTIONS

**Section 6.02**     **Allocations.** The Parties, including the Company, acknowledge and agree that, notwithstanding anything to the contrary, each Seller shall be allocated all Company tax items of income and gain (and individual items thereof) respecting or relating to the applicable Purchased Units for all periods ending on or prior to the Closing Date and, to the extent necessary to accomplish the foregoing, a closing-of-the-books election shall be made respecting the Purchased Units as of the end of the Closing Date.

**Section 6.03**     **General**.  Without the prior written consent of Buyer, in each instance to the extent any of the foregoing affects or relates, or could reasonably be expected to affect or relate, to a Company, any of its respective members, or Buyer (or any of its ultimate beneficial owners), except to the extent consistent with Section 6.02, no Seller shall (a) file, refile, or amend any tax return or make any administrative adjustment request, (b) make, revoke, rescind, modify, or amend any tax-related election, or (c) take any position, whether in connection with any action, audit, investigation, appeal, or proceeding, respecting any of the foregoing.  Each Seller agrees that neither Company, nor any of its respective members, nor Buyer (nor any of its ultimate beneficial owners) is to have any direct or indirect liability for any tax resulting from any action or omission of such Seller, except as the tax law may require as a result of the execution and performance of this Agreement, and to such Seller's knowledge no such liability would exist.  Each Seller agrees to indemnify and hold harmless Buyer (and Buyer's ultimate beneficial owners) against any tax or reduction of any tax asset, attribute, or benefit arising from any action of such Seller, except as the tax law may require as a result of the execution and performance of this Agreement, and to such Seller's knowledge no such tax or reduction of any tax asset, attribute, or benefit would exist.  If

4828-5414-5273

any action is taken or election is made that would cause the applicable Company or Buyer to be liable, directly or indirectly, for any tax or liability as a result of the application of the (i) an election pursuant to Section 1101(g)(4) of P.L. 144-74 (2015) (or any corresponding or similar state or local Law or any Treasury Regulations promulgated with respect thereto), or (ii) the provisions of Subchapter C of Subtitle A, Chapter 63 of the Code, as amended by P.L. 114-74, the Bipartisan Budget Act of 2015 (together with any subsequent amendments thereto, Treasury Regulations promulgated thereunder, and published administrative interpretations thereof), which tax or liability relates directly or indirectly to the applicable Purchased Units for, during, or with respect to any period ending on or prior to the Closing Date (*e.g.,* taxes arising from an allocation of such Company tax items to, or with respect to, the applicable Purchased Units during a period or portion thereof ending prior to the Closing Date), then such Seller shall be liable for such tax and/or liability, and shall indemnify and hold Buyer harmless from any such tax and/or liability.

Section 6.04    **Distributions**. The Parties, including the Companies, each acknowledge and agree that, notwithstanding anything to the contrary, any distributions made by a Company with respect to the Purchased Units after the Closing Date shall be for the account of Buyer, and to the extent any such distribution is received by a Seller, then such Seller shall (a) treat all such amounts as having been received by such Seller on behalf of Buyer, and (b) shall immediately remit such amounts to Buyer, free and clear of all Encumbrances and/or withholdings; provided, however, that in the event the Closing occurs on a day other than the first day of a fiscal quarter of such Company with respect to any distribution of Distributable Cash (as defined in such LLC Agreement) made by such Company after the Closing Date that is attributable to such fiscal quarter, Sellers shall be entitled to, and Buyer shall pay to such Seller within five (5) business days after Buyer receives such distribution (or cause such Company to pay to such Seller as part of such distribution) a proportionate share of such distribution based upon the number of days such Seller was the holder of the applicable Purchased Units during such fiscal quarter.

Section 6.05    **Tax Reporting.** Each Party, including each Company, will report the transactions, and the federal and state tax consequences of the transactions contemplated in this Agreement, in each instance accordance with the provisions of this Agreement and to file all tax returns, reports and other forms (*e.g.,* Schedule K-1) in a manner consistent with such provisions, and no Party, including the Companies, will take any position in any such tax return, report or other form, including any amendment thereto, or reach any settlement or agreement in respect of any audit which, in any case, is inconsistent with such provisions, unless such inconsistency is mandated by applicable law. Each Company shall make an election contemplated in Code Section 754 and the Treasury Regulations promulgated thereunder with respect to the acquisition of the Purchased Units as contemplated in this Agreement.

**ARTICLE VII**
**INDEMNIFICATION**

Section 7.02    **Survival of Representations and Covenants.** All representations, warranties, covenants and agreements contained herein and all related rights to indemnification shall survive the Closing.

31

**Section 7.03    Indemnification By Seller Parties.**

(a)    Subject to the other terms and conditions of this ARTICLE VII, each Seller together with its related Seller Party(ies) (on a joint and several basis as to each Seller and its Seller Parties and not as to all Sellers together) (each, such group a "**Seller Party Indemnifying Group**") shall defend, indemnify and hold harmless Buyer, its affiliates and their respective members, ultimate beneficial owners, managers, partners, officers and employees (each a "**Buyer Indemnified Party**") from and against:

(ii)    all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements (a "**Loss**"), arising from or relating to any inaccuracy in or breach of any of the representations or warranties (other than the Company-Level Representations) of such Seller contained in this Agreement or any document to be delivered hereunder;

(iii)    any Loss arising from or relating to any breach or non-fulfillment of any covenant, agreement or obligation to be performed by such Seller pursuant to this Agreement or any document to be delivered hereunder; or

(iv)    the amount of any imputed underpayment (as described in Section 6225 of the Code) imposed on either Company and allocable to the related Seller or attributable to the Purchased Units during taxable years, or portions thereof, when such related Seller owned the applicable Purchased Units (with respect to each Seller, the "**Seller Ownership Period**"), or any other income tax assessment imposed on the related Company under any similar provision of state or local law and allocable to the Seller or attributable to the applicable Purchased Units during the related Seller Ownership Period.

(b)    Subject to the other terms and conditions of this ARTICLE VII, all of the Sellers and Seller Parties, on a joint and several basis, shall defend, indemnify and hold harmless Buyer, its affiliates and their respective members, ultimate beneficial owners, managers, partners, officers and employees from and against all Losses arising from or relating to any inaccuracy in or breach of any of the Company-Level Representations contained in this Agreement, except with respect to APE and Jason Reaves in connection with any liability stemming from a Company-Level Representation of Renfroe SC of which APE and Jason Reaves own no interest.

**Section 7.04    Indemnification By Buyer.** Subject to the other terms and conditions of this ARTICLE VII, Buyer shall defend, indemnify and hold harmless each Seller from and against all Losses arising from or relating to:

(a)    any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any document to be delivered hereunder; or

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement or any document to be delivered hereunder.

**Section 7.05     Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the Party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. If the Indemnifying Party assumes the defense of any such Action, and the Indemnifying Party wishes to settle such Action, the Indemnifying Party shall give notice of the proposed settlement to the Indemnified Party.  If the Indemnified Party does not object to such settlement in writing within seven (7) days of such notice, the Indemnifying Party may enter into such settlement.  If the Indemnified Party objects to the settlement in writing within such time period, the Indemnifying Party may not enter into such settlement, but thereafter the indemnification obligations of the Indemnifying Party to the Indemnified Party shall be limited to the amount of the proposed settlement.

**Section 7.06     Payments.** Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this ARTICLE VII, the Indemnifying Party shall satisfy its obligations within thirty (30) days of such final, non-appealable adjudication by (a) wire transfer of immediately available funds, or, (b) if payable by a Seller and at the election of Buyer, withheld and set off against the Purchase Price pursuant to the terms and conditions of <u>Section 1.07</u>. The Parties hereto agree that should an Indemnifying Party not make full payment of any such obligations within such 30 day period, any amount payable shall accrue interest from and including the date of agreement of the Indemnifying Party or final, non-appealable adjudication to the date such payment has been made at a rate per annum equal to ten percent (10%). Such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

**Section 7.07     Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the Parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**Section 7.08     Effect of Investigation.** Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of each Seller contained herein

will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

Section 7.09     **Cumulative Remedies.** The rights and remedies provided in this ARTICLE VII are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

## ARTICLE VIII
## TERMINATION

Section 8.02     **Termination**. Without prejudice to other remedies which may be available to the parties hereto pursuant to this Agreement, this Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)     By mutual written consent of the Buyer and Sellers;

(b)     Breach of Representations, Warranties, Covenants or Agreements.

(ii)     By the Buyer upon delivery of written notice to Sellers, if there has been a material breach of any representation, warranty, covenant or agreement made by or in respect of either Company or a Seller Party in this Agreement, which breach (i) would give rise to the failure of a condition set forth in Section 5.02(b) and (ii) (x) cannot be cured by the End Date (as defined below) or (y) if capable of being cured, shall not have been cured by the earlier of (1) thirty (30) days following receipt of written notice from the Buyer of such breach or (2) the date that is three (3) days prior to the End Date;

(iii)     By Sellers upon delivery of written notice to the Buyer, if there has been a material breach of any representation, warranty, covenant or agreement made by the Buyer in this Agreement, which breach (i) would give rise to the failure of a condition set forth in   Section 5.02(a) and (ii)(x) cannot be cured prior to the End Date or (y) if capable of being cured, shall not have been cured by the earlier of (1) thirty (30) days following receipt of written notice from Sellers of such breach or (2) the date that is three (3) days prior to the End Date;

(c)     End Date.  By either the Buyer or Sellers upon delivery of written notice to the other if the Closing has not occurred on or before 11:59 p.m. Mountain Standard Time, on October 31, 2021 (the "**End Date**"); provided that neither the Buyer nor Sellers will be entitled to terminate this Agreement pursuant to this Section if such Person's (or, in the case of the Sellers, either Company's or another Seller Party's) breach of, or failure to fulfill any obligation under, this Agreement has been the principal cause of the failure of the Closing to occur on or prior to such time on the End Date;

4828-5414-5273

(d)     Orders; Laws.  By either the Buyer or Sellers, upon delivery of written notice to the other, if any Governmental Entity shall have issued or entered any judgment, order or decree, enacted any law or taken any other action which, in any such case, (i) permanently restrains, enjoins or otherwise prohibits the consummation of all or substantially all of the transactions contemplated by this Agreement, (ii) would prevent the Closing from occurring on or prior to the applicable time on the End Date or (iii) has had or would reasonably be expected to have a material adverse effect on the business, properties or condition (financial or otherwise) of either Company; provided, however, that neither the Buyer nor Sellers will be entitled to terminate this Agreement pursuant to this if (x) the issuance or entry of such judgment, order or decree of a Governmental Entity is the principal result of such Person's (or, in the case of the Sellers, either Company's or another Seller Party's) willful breach of, or willful failure to fulfill any obligation under, this Agreement or (y) such Person (or, in the case of the Sellers, either Company's or another Seller Party's) shall have breached its obligations under (and subject to the limitations in) this Agreement to resist, resolve or lift such judgment, order or decree of a Governmental Entity or law; or

**Section 8.03     Effect of Termination**.  Subject to the provisions of this Section, the rights of termination set forth above are in addition to any other rights a terminating party may have under this Agreement and the exercise of a right of termination will not be an election of remedies. Notwithstanding the foregoing sentence, in the event of any termination of this Agreement by either the Buyer or Sellers as provided in ARTICLE VIII, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of any party or any of its or their affiliates to any other Person by virtue of, arising out of or otherwise in connection with this Agreement except that (i) nothing in this Agreement will relieve any party from any breach of this Agreement prior to such termination or for fraud and (ii) Section 5.03(b)(iii) (Confidentiality) and ARTICLE IX (Miscellaneous) and any pre-termination breaches of such provisions shall survive any termination of this Agreement and each party shall be entitled to all remedies available at law or in equity in connection with any past or future breach of any such provision.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.02     Expenses.**  Except as otherwise provided in Section 1.03(b)(i)(A), Section 1.05 and Section 2.11, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

**Section 9.03     Further Assurances.**  Following the Closing, each of the Parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

4828-5414-5273

**Section 9.04** **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 9.04):

| | |
|---|---|
| If to a Seller: | To the address set forth on Schedule 1-A |
| If to Buyer: | Verde Outdoor Media, LLC<br>1720 W. Rio Salado Parkway<br>Tempe, AZ 85281<br>Attention: Steven P. Johnson<br>Email: SJohnson@verdeinvestments.com |
| with a copy (which shall not constitute notice) to: | Snell & Wilmer L.L.P.<br>400 East Van Buren<br>Phoenix, Arizona 85004-2202<br>Attention: Brian William Burke<br>Email: bburke@swlaw.com |
| If to either Company: | Renfroe Outdoor, LLC; or<br>Renfroe Outdoor SC, LLC<br>741 Johnnie Dodds Blvd, Suite 300<br>Mt. Pleasant SC 29464<br>Attention: John E. Renfroe<br>Email: jedr@renfroeoutdoor.com |
| with a copy (which shall not constitute notice) to: | Adams, Hemingway, Wilson & Rutledge, LLC<br>P.O. Box 1951<br>Macon, Georgia 31202<br>Attention: Jeffrey M. Rutledge<br>Email: jeff.rutledge@adamshemingway.com |

**Section 9.05** **Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

36

**Section 9.06    Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify the Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.07    Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

**Section 9.08    Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Neither Party may assign its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning Party of any of its obligations hereunder.

**Section 9.09    No Third-Party Beneficiaries.** Except as provided in ARTICLE VI and ARTICLE VII, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.10    Amendment and Modification.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto.

**Section 9.11    Waiver.** No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.12    Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia without giving effect to any choice or conflict of law provision or rule (whether of the State of Georgia or any other jurisdiction).

**Section 9.13    Submission to Jurisdiction.** Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in

4828-5414-5273

the federal courts of the United States of America or the courts of the State of Georgia, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

Section 9.14    **Company Representation as to Authority to Sign Agreement**. The Company and undersigned signing this Agreement on behalf of the Company hereby warrant and represent that each such Person has the actual authority to sign this Agreement on behalf of the Company, and that this Agreement is binding upon the Company.

Section 9.15    **Waiver of Jury Trial.** Each Party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 9.16    **Specific Performance.** The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 9.17    **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

4828-5414-5273

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER PARTIES:**

**JR MEDIA CO., LLC**, a Georgia limited liability company

By: _____
Name: Marcus Benjamin Jones
Title: Manager

**A.P.E. HOLDINGS, LLC**, a Georgia limited liability company

By: _____
Name: Jason Reaves
Title: Manager

_____
**JOHN E. RENFROE**

_____
**CHRISTA R. HURLEY**

Solely for purposes of ARTICLE IV, ARTICLE V, ARTICLE VII, <u>Section 8.03</u> and ARTICLE IX:

By: _____
Name: Marcus Benjamin Jones

By: _____
Name: Jason Reaves

**BUYER:**

**VERDE OUTDOOR MEDIA, LLC**, an
Arizona limited liability company

By: _Steven P. Johnson_
Name: _Steven P. Johnson_
Title: _Manager_

**COMPANIES:**

**RENFROE OUTDOOR, LLC**, a Georgia limited liability company

By: _____
Name: John E. Renfroe
Title: Manager

**RENFROE OUTDOOR SC, LLC**, a Georgia limited liability company

By: _____
Name: John E. Renfroe
Title: Manager

[Signature Page to Membership Interest Purchase Agreement]