## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

|  |  |
|---|---|
| JR MEDIA CO., LLC and CHRISTA HURLEY,<br> Plaintiffs,<br><br>v.<br><br>VERDE OUTDOOR MEDIA, LLC<br> Defendant,<br><br>- and -<br><br>VERDE OUTDOOR MEDIA, LLC and VERDE OUTDOOR SE, LLC,<br> Counterclaim-Plaintiffs,<br><br>v.<br><br>JOHN E. RENFROE, CHRISTA R. HURLEY, MARCUS BENJAMIN JONES, and JR MEDIA CO., LLC,<br> Counterclaim-Defendants. | Civil Action File No.:<br>2:25-cv-00036-LGW-BWC |

## PARTIAL MOTION TO DISMISS AMENDED COUNTERCLAIM

Pursuant to Fed. R. Civ. P. 12(b)(6), Counterclaim-Defendants Christa R. Hurley ("Hurley"), Marcus Benjamin Jones ("Jones"), and JR Media Co., LLC ("JR Media") file this Partial Motion to Dismiss Verde Outdoor Media, LLC's and Verde Outdoor SE, LLC's (collectively "Verde") Amended Counterclaim, representing to the Court as follows:

### INTRODUCTION

The present dispute is nothing more than a matter of contractual interpretation. Hurley and JR Media,[1] together with Counterclaim Defendant Jed Renfroe ("Jed Renfroe") and nonparty A.P.E.

---

[1] Jones is the owner of JR Media and at all times acted through JR Media in the sale of the Businesses. Unless otherwise specified, references to JR Media include Jones in such capacity.

Holdings, LLC ("APE") (collectively "Sellers") were members of two limited liability companies (the "Businesses") that owned and operated outdoor billboard structures (the "Assets"). Verde, a competing billboard advertising company, sought to acquire the Businesses and entered into the Membership Interest Purchase Agreement (the "MIPA") on October 29, 2021, acquiring a majority interest in the Businesses in exchange for a Purchase Price, subject to certain "Post-Closing Adjustments".

Following the Closing of the MIPA, a dispute arose between Hurley, JR Media, and Verde concerning the Post-Closing Adjustments to the Purchase Price. In short, Verde contended that the Post-Closing Adjustments required under the MIPA were far broader and greater than Hurley and JR Media believed. After nearly a year of negotiations between the parties and their counsel, Verde executed Settlement and Release Agreements with Hurley and JR Media (collectively the "Settlement Agreements") resolving, settling, and releasing "any and all claims" related to the Post-Closing Adjustments to the Purchase Price, except for claims relating to two billboard sites in Charleston, South Carolina (the "Charleston 2"). By their plain language, the Settlement Agreements superseded the MIPA and constituted "the sole and entire agreement of the parties regarding the subject matter contained herein, and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter."

Consistent with the terms of the Settlement Agreements, Hurley and JR Media filed a one-count Complaint for Declaratory Judgment against Verde on January 21, 2025, seeking judicial construction of certain language in the MIPA related to Verde's obligation to pay Hurley and JR Media for the Charleston 2. Verde answered the Complaint on March 17, 2025, asserting two counterclaims for breach of contract limited solely to the Charleston 2 as permitted by express language of the Settlement Agreements. Now, thirteen (13) months later, Verde seeks to rescind the Settlement Agreements so that it may assert a host of Amended Counterclaims including claims for violations of

Georgia's Racketeer Influenced and Corrupt Organizations Act ("RICO"), fraud, money had and received, and aiding and abetting relating to all billboards governed by the MIPA, not just the Charleston 2. Verde's new claims all stem from its allegation that it was fraudulently deprived of benefits to which it was entitled under the MIPA, that is, Post-Closing Adjustments to the Purchase Price. The MIPA, however, was expressly superseded and all Post-Closing Adjustments to the Purchase Price were expressly released by the Settlement Agreements (except for the Charleston 2).

Thus, Verde impermissibly asks this Court to completely disregard the plain language of the Settlement Agreements and to reinstate and re-write the provisions of the MIPA to impose obligations that do not exist. Acknowledging that its claims are barred by the Settlement Agreements, Verde first seeks to rescind the Settlement Agreements so that it may pursue these prohibited claims. There is no valid basis to rescind the Settlement Agreements, however. Verde entered into the Settlement Agreements knowingly and voluntarily, waived any right to rescind the Settlement Agreements by accepting the benefits thereunder (benefits that it still enjoys), and failed to promptly seek rescission. Georgia law strongly favors settlement agreements and strongly enforces contracts on their plain terms. Simply stated, Verde's new claims are barred by the Settlement Agreements.

Moreover, Verde's fraud allegations ring hollow. Verde claims that Hurley and JR Media fraudulently concealed materials facts that induced Verde to enter into the Settlement Agreements. This statement, however, is completely belied by actual factual allegations in Verde's Complaint. This Court is not required to accept Verde's conclusory statements as true, but must look past the formulaic recitation of the elements to the foundational facts, which establish Verde was actually aware of the alleged "scheme" it contends was concealed.

## STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a complaint if it fails to "state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). To decide whether a complaint survives a Rule

12(b)(6) motion to dismiss, courts use a two-step framework. *See McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (Citation omitted). First, the court "identif[ies] the allegations that are 'no more than conclusions.'" *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)).[2] Second, after disregarding the conclusory allegations, the court must "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.*

To plausibly give rise to an entitlement to relief, a plaintiff must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007). And "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. Moreover, where claims of fraud or RICO are alleged, an increased level of specificity is required. *See, e.g.*, *Pombert v. Glock, Inc.*, 171 F. Supp. 3d 1321, 1335 (N.D. Ga. 2016).

> Thus, a plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud. Moreover, a plaintiff may not lump together the defendants; a plaintiff must make specific allegations against each defendant.

*Id.* (Citation and punctuation omitted). Furthermore, on a motion to dismiss, the court may consider documents attached in the pleadings and referenced in the complaint. *See Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1215–16 (11th Cir. 2012). The court may also "consider exhibits attached to a motion to dismiss without converting the motion into one for summary judgment if the exhibits are (1) central to plaintiff's claim and (2) their authenticity is not disputed." *See Crawford's Auto*

---

[2] "Conclusory allegations are not entitled to the assumption of truth." *Id*; *see also Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944, 92 L. Ed. 2d 209 (1986) (Courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

*Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1162 (11th Cir. 2019) (Citations omitted). If such "exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007). "And if the appended document reveals facts which foreclose recovery as a matter of law, dismissal is appropriate." *Mi9 Retail, Inc. v. Home Depot, Inc.*, 1:20-CV-00525-WMR, 2020 WL 8087924, at *3 (N.D. Ga. Dec. 7, 2020) (citing *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007)).

Accordingly, "[t]he Eleventh Circuit allows district courts to engage in contract interpretation at the motion to dismiss stage where the contract terms are unambiguous." *Whertec, Inc. v. Salmon*, 3:20-CV-1254-BJD-PDB, 2021 WL 3555676, at *2 (M.D. Fla. Apr. 28, 2021) Indeed, "[w]here the language of a contract is clear and unambiguous, 'the court applies is plain meaning' – even on a motion to dismiss." *Mi9 Retail, Inc.*, 1:20-CV-00525-WMR, 2020 WL 8087924, at *6 (N.D. Ga. Dec. 7, 2020) (citing *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237 (11th Cir. 2019)).

## FACTUAL ALLEGATIONS

On or about October 29, 2021, Verde and Sellers entered into the MIPA whereby Verde agreed to purchase and Sellers agreed to sell some or all of Seller's membership interests in the Businesses. [*See* ECF 1-2, *generally*].[3] Specifically, on the Closing Date, defined as October 29, 2021, Verde acquired eighty-five (85%) of the membership interests in the Business, completely divesting Hurley, JR Media, and APE of all membership interests each previously owned. [*See* ECF 25, ¶ 16]. Jed Renfroe, the only Seller retaining any ownership of the Business, held the remaining fifteen percent (15%) of the membership interests not acquired by Verde. [*Id*].

Pursuant to Section 1.03(a) of the MIPA, Verde agreed to pay Sellers for their membership interests based upon a formula that characterized each of the Assets as falling within one of three (3)

---

[3] A copy of the MIPA is filed in the record as ECF No. 1-2. For purposes of this Motion to Dismiss, the Court may consider the MIPA, along with the settlement agreements discussed below. *See Mathieson v. Wells Fargo Bank, N.A.*, 8:20-CV-2728-WFJ-SPF, 2021 WL 4078140, at *4 (M.D. Fla. Sept. 8, 2021).

categories: "Existing Sites", "Permitted Development Sites", and "Unpermitted Development Sites". [*Id.* at Sec. 1.03(a)]. Existing Sites were generally defined as the Assets in operation as of the Closing Date. [*Id*]. The Purchase Price for the Existing Sites was calculated as a 10x multiple of the actual cash flow (the "Existing BCF") generated by this category of Assets. [*Id*]. Permitted Development Sites were generally defined as the Assets that were permitted as of the Closing Date but not yet operational. [*Id*]. The Purchase Price for the Permitted Development Sites was calculated as a 10x multiple of the estimated cash flow (the "Estimated BCF") to be generated by this category of Assets. [*Id*]. Unpermitted Development Sites were generally defined as the Assets that were "not yet permitted but [were] scheduled to be permitted within six (6) months of the Closing and operational within twelve (12) months after the Closing." [*Id*]. The Purchase Price for the Unpermitted Development Sites was calculated as an 8x multiple of the Estimated BCF to be generated by this category of Assets. [*Id*].

Section 1.03(b) of the MIPA, however, contained terms for the "Post-Closing Adjustments" to the Purchase Price related to the Permitted Development Sites and the Unpermitted Development Sites. [*See* ECF 1-2, Sec. 1.03(b)]. Specifically, under Section 1.03(b)(i)(B) of the MIPA, the Purchase Price for each Permitted Development Site and Unpermitted Development Site would be adjusted to reflect the actual cash flow for the twelve (12) full calendar months of operation (the "Actual BCF"). [*Id*]. For calculation of the Post-Closing Adjustments, the end of the twelve (12) full calendar months of operation constituted the "True-Up Date" for each Permitted Development Site and Unpermitted Development Site. [*Id*]. Within sixty (60) days after each True Up Date, Verde was required to prepare and deliver to Sellers a "Development BCF True-Up Statement" along with reasonable supporting documentation that compared the Estimated BCF upon which the Purchase Price was calculated at Closing to the Actual BCF as of the True-Up Date. [*Id*]. After all Development BCF Statements were produced, reviewed, and accepted by the parties, all adjustments to the Purchase Price were to "be

made collectively, with increases being offset by reductions, to produce a single net adjustment to the Purchase Price (the 'Net Adjustment')." [*Id.* at Sec. 1.03(b)(i)(D)].

On or about August 27, 2024, Verde provided Hurley and JR Media with information from which a Development BCF True-Up Statement could be generated for all Permitted Development Sites and Unpermitted Developments Sites and demanded repayment of a portion of the Purchase Price under the Post-Closing Adjustments provision of the MIPA. [*See* ECF 1-1, ¶ 43; *accord* ECF 6, ¶ 43]. After reviewing this information, Hurley and JR Media disputed $1,529,336.51 in combined Post-Closing Adjustments to the Purchase Price. [*See* ECR 1-1, ¶ 44; *see also* ECF 25, ¶¶ 30-31]. Ultimately, after extensive negotiations in which all parties were represented by counsel, Verde, Hurley, and JR Media resolved all disputes concerning the Post-Closing Adjustments to the Purchase Price, except the disputes concerning the Charleston 2 (the "Charleston 2 Dispute"). [*See, e.g.,* ECF 25, ¶¶ 30-31].

To that end, on or about December 17, 2024, Verde entered a Settlement Agreement with Hurley, a true and correct copy of which is attached hereto as **Exhibit A**, memorializing its agreement with Hurley to settle all amounts owed under the MIPA and forever release one another from any and all claims concerning, *inter alia*, the Post-Closing Adjustments to the Purchase Price (excluding the Charleston 2). [*See* Ex. A, Recitals].[4] Likewise, on or about January 8, 2025, Verde entered into the Settlement Agreement with JR Media, a true and correct copy of which is attached hereto as **Exhibit B**, memorializing its agreement with JR Media to settlement all amounts owed under the MIPA and forever release one another from all claims concerning, *inter alia*, Post-Closing Adjustments to the Purchase Price (excluding the Charleston 2). [*See* Ex. B, Recitals]. Each of the Settlement Agreements unambiguously provide that "Verde, on behalf of itself and its successors, assigns, agents, representatives, and any other person or entity acting on its behalf," hereby releases Hurley and JR

---

[4] Although seeking to rescind the agreement, Verde intentionally and conspicuously omits the Settlement Agreements from its Amended Counterclaim. But, the Court is still permitted to consider the entirety of this Agreement even though it was not attached to Verde's Amended Counterclaim. *See Crawford's Auto Ctr., Inc.*, 945 F.3d at 1162.

Media, and their respective successors, assigns, agents, representatives, and all other persons or entities acting on their behalf, including Jones, from:

> **any and all** claims, demands, liabilities, obligations, damages, actions, and causes of action, whether known or unknown, which exist or may exist under the [MIPA] as of the Effective Date but only with respect to: (a) the Purchase Price Adjustment described in this Agreement, excluding the Charleston 2 Dispute; (b) the Closing Prorations; and (c) the CapEx Funds.

[Ex. A at ¶¶ 3(a), 3(d)(a); Ex. B at ¶¶ 3(a), 4(a) (emphasis added)].[5]

After the execution of the Settlement Agreements, Hurley and JR Media filed a one (1) count Complaint for Declaratory Judgment against Verde on January 21, 2025, asking the Court to interpret and apply specific language of the MIPA in connection with the Charleston 2 Dispute. [*See* ECF 1-1, *generally*]. Verde thereafter removed the present action to federal court on March 10, 2025. [*See* ECF 1]. On March 17, 2025, Verde answered the Complaint and filed Counterclaims solely regarding the Charleston 2 Dispute. [*See* ECF 6].

Verde has since, however, filed an Amended Counterclaim seeking to rescind the Settlement Agreements and asserting the very claims that were released thereunder, that is, claims arising from the Post-Closing Adjustments under the MIPA. [*See* ECF 25, *generally*]. Verde alleges that Sellers orchestrated a scheme labeled the "Great Check Exchange Program" designed "to avoid compliance with their legal obligations under the Net Adjustment provision" of the MIPA (*i.e.*, the Post-Closing Adjustment provision) and "defraud [Verde] out of millions of dollars to which they were rightfully entitled under the [MIPA]…" [*Id.* at ¶¶ 34, 73]. Specifically, Verde alleges that following Closing of the MIPA, Sellers realized they were on track to owe Verde money when the Net Adjustment to the Purchase Price was calculated. [*Id.* at ¶ 73]. To avoid paying "the difference between the Estimated BCF and Actual BCF for the True-Up Sites during the True-Up Period," Sellers allegedly sought to

---

[5] Jones is the owner of JR Media and therefore a released party under the Settlement Agreement between Verde and JR Media.

increase the Actual BCF of the Permitted Development Sites and Unpermitted Development Sites by paying, directly or indirectly, for third parties to advertise with Verde. [*Id.* at ¶¶ 42-43, 50]. Verde claims it lacked knowledge that Sellers were allegedly paying for third parties to advertise with Verde, and Sellers took steps to prevent Verde from learning of such conduct. [*See, e.g., Id.* at ¶¶ 109-14]. For example, Verde alleges Hurley formed an entity named Eyes on Ads, LLC "to act as a middleman, concealing from Verde the fact that Sellers were either paying directly or indirectly for advertising purchased" by third parties. [*Id.* at ¶ 162]. Based on this alleged concealment, Verde claims it was defrauded out of money to which it was rightfully entitled under the MIPA. [*See, e.g., Id.* at ¶¶ 34, 109-14].

At the same time, however, Verde admits in its Amended Counterclaim that several of its employees – including employees with the authority to bind Verde – had knowledge of and, in fact, participated in the "Great Check Exchange Program". [*Id.* at ¶ 71]. Indeed, each advertising contract that Verde asserts formed a part of the Great Check Exchange Program was executed by a representative of Verde. [*Id.* at ¶¶ 94-341]. More significantly, while alleging Hurley formed Eyes on Ads, LLC to conceal Sellers' identity, Verde admits that Hurley emailed Verde from her personal email identifying Eyes on Ads, LLC as her entity; admits that each contract Verde entered into with Eyes on Ads used Hurley's Gmail address, her personal telephone number, and was personally executed by Hurley; and admits that all payments received from Eyes on Ads, LLC were from either Hurley's or her husband's American Express card. [*Id.* ¶¶ 159-71].

## MEMORANDUM OF LAW

Regardless of the manner in which Verde casts its allegations and causes of action, its Amended Counterclaims are fundamentally a matter of contractual construction. All of Verde's new claims are predicated upon its allegations that Hurley and JR Media conspired to and, in fact, engaged in a fraudulent scheme to deprive it of benefits to which it was rightfully entitled under the MIPA,

that is, Post-Closing Adjustments to the Purchase Price. To prevail, Verde must not only establish that it was deprived of a benefit to which it was entitled under the MIPA, but must also show that it was defrauded of such benefit. Even by Verde's own admissions, the resolution of this case, at least initially, turns on the application of the MIPA.

The MIPA, however, was expressly superseded by the Settlement Agreements. This Court must first construe and apply the terms of the Settlement Agreements as a threshold issue. Here, the terms of the Settlement Agreements are clear and unambiguous. The Settlement Agreements clearly released "any and all claims… with respect to: (a) the Purchase Price Adjustment described in this Agreement, excluding the Charleston 2 Dispute;…" [Ex. A at ¶¶ 3(a), 3(d)(a); Ex. B at ¶¶ 3(a), 4(a)] Moreover, the Settlement Agreements expressly provide that each constitutes "the sole and entire agreement of the parties regarding the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter." [Ex. A, ¶ 6(h); Ex. B, 7(h)]. To the extent Verde claims that it is entitled to or deprived of a benefit under the MIPA, the Settlement Agreement superseded the MIPA, controls the obligations between the parties, and bars any claims thereunder unless related to the Charleston 2.

Hence, Verde seeks to rescind the Settlement Agreements to circumvent the effect of the releases and merger clauses by alleging that Hurley and JR Media fraudulently concealed material facts that induced Verde to enter into the Settlement Agreements. Significantly, to prevail on a claim for fraudulent concealment, Verde must establish not only the essential elements for fraud, but also that Hurley and JR Media had a duty to disclose the material facts Verde alleges were concealed. In the context of an arm's length transaction between business competitors, that analysis again turns on the construction and application of the Settlement Agreements and/or MIPA. Neither agreement, however, creates a duty of disclosure that would support Verde's claim for fraudulent concealment. Even more problematic, however, Verde **admits** that it was aware that Hurley and JR Media were

paying for third parties to advertise with Verde. Verde's claim for recission must fail where its fraud claim fails. Moreover, because all of Verde's new claims are predicated on its fraud allegations, then all of these new claims must also fail.

### I.   Verde's Amended Counterclaims Are Barred By The Settlement Agreements.

As a threshold matter, Verde's Amended Counterclaim is barred by the Settlement Agreements. "[U]nder the Federal Rules of Civil Procedure, 'release is an affirmative defense and such a defense will support a motion to dismiss where it is (1) definitively ascertainable from the complaint and other sources of information that are reviewable at this stage, and (2) the facts establish the affirmative defense with certitude." *Avery v. Grubb*, 336 Ga. App. 452, 453, 784 S.E.2d 817, 819 (2016) (Internal punctuation omitted) (citing *Citibank Global Markets, Inc. v. Santana*, 573 F.3d 17, 23 (1st Cir. 2009)). In this case, both conditions are met. The Settlement Agreements are properly before the Court[6] and, notwithstanding Verde's attempted rescission, unequivocally bar Verde's new claims.

### A.   Verde Released Its Amended Counterclaims Under the Express Provisions of the Settlement Agreements.

"A release or settlement agreement is a contract subject to construction by the court." *Avery*, 336 Ga. App. at 458, 784 S.E.2d at 822 (citing *UniFund Financial Corp. v. Donaghue*, 288 Ga. App. 81, 82, 653 S.E.2d 513 (2007)). "The cardinal rule of construction is to determine the intention of the parties." *Darby v. Mathis*, 212 Ga. App. 444, 444, 441 S.E.2d 905, 906 (1994). "But no construction is required or even permissible when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation." *Id.* "And a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *Coca-Cola Bottlers' Sales & Servs. Co. LLC v. Novelis Corp.*, 311 Ga. App. 161, 163, 715 S.E.2d 692, 695 (2011).

---

[6] *See Crawford's Auto Ctr., Inc.*, 945 F.3d at 1162.

In this case, the Settlement Agreements are undeniably clear and unambiguous. Pursuant to the Settlement Agreements, Verde, on behalf of itself and its successors, assigns, agents, representatives, and any other person or entity acting on its behalf, thereby:

> release[d] [Hurley and JR Media] and [their] successors, assigns, agents, representatives, and any other person or entity acting on [their] behalf, from any and all claims, demands, liabilities, obligations, damages, actions, and causes of action, whether known or unknown, which exist or may exist under the Purchase Agreement as of the Effective Date but only with respect to: (a) the Purchase Price Adjustment described in this Agreement, excluding the Charleston 2 Dispute; (b) the Closing Prorations; and (c) the CapEx
> Funds…

[Ex. A at ¶¶ 3(a), 3(d)(a); Ex. B at ¶¶ 3(a), 4(a)]. Significantly, the Settlement Agreements only expressly reserved claims between the Parties related to the Charleston 2. *See id.* at ¶ 5. All other claims were released, including the very claims asserted by Verde in its Amended Counterclaim. *Id.* Indeed, Verde's claims for RICO, fraud, money had and received, and aiding and abetting are all, as admitted by Verde, predicated on Verde's allegation(s) that Sellers allegedly participated in the "Great Check Exchange Program" so as to avoid paying Verde the correct Net Adjustment Amount under the MIPA. [ECF 25, ¶51].

### B. The Settlement Agreements Further Bar Verde's Amended Counterclaim Through Accord and Satisfaction and Supersession of the MIPA.

Furthermore, the Settlement Agreements constitute an accord and satisfaction of and supersede the MIPA. "An accord and satisfaction is an agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other, ***which when performed is a bar to all actions on this account***." *Woodstock Rd. Inv. Properties v. Lacy*, 149 Ga. App. 593, 593–94, 254 S.E.2d 910, 911 (1979) (Emphasis added) (Citation omitted). An accord and satisfaction is created when "the parties to an agreement, by a subsequent agreement, have satisfied the former agreement, and the latter agreement has been executed." O.C.G.A. § 13-4-101. It "may

settle one or more claims, or a portion of a claim, without prejudicing the remaining claims." *Hosp. Auth. of Houston Cnty. v. Pyrotechnic Specialties, Inc.*, 263 Ga. App. 886, 888, 589 S.E.2d 644, 646 (2003).

Here, the Settlement Agreements expressly acknowledge that Verde, Hurley, and JR Media were parties to the MIPA, which "contemplate[d] a Net Adjustment event at which all adjustments to the Purchase Price for the Permitted Development Sites and Unpermitted Development Sites w[ould] be made concurrently (the 'Purchase Price Adjustment')"; that "the result of the Net Adjustment is such that" Hurley and JR Media owed Verde certain amounts; and that Verde owed Hurley and JR Media certain amounts under the MIPA. [Ex. A, Recitals; Ex. B, Recitals]. After acknowledging each party owed certain amounts under the MIPA, the Settlement Agreements expressly state that Verde, Hurley, and JR Media desired to "(i) pay and settle all amounts owed to one another; and (ii) forever release one another from any further obligation, with respect to the above described items [*e.g.* the MIPA, the Unpermitted Development Sites, the Post-Closing Purchase Price Adjustment process established by Section 1.03 of the MIPA]….", but expressly excluding the Charleston 2 Dispute. [Ex. A, p. 2; Ex. B, p. 2]. Accordingly, pursuant to the Settlement Agreements, Verde paid Hurley and JR Media $329,931.00 and $838,954.00, respectively, which amounts Verde acknowledged were due to Hurley and JR Media under the MIPA, and Hurley and JR Media paid Verde $1,813,372.00 and $1,208,908.00, respectively, which amounts Hurley and JR Media acknowledged were due to Verde under the MIPA. [*See* Ex. A, ¶¶ 1-2; Ex. B, ¶¶ 1-2].

The execution of these mutual payments constitutes a fully performed accord and satisfaction of the parties' disputed obligations under the MIPA's Purchase Price Adjustment mechanism. Indeed, Verde itself admits that the Settlement Agreements resolved certain amounts owed under the MIPA, [*See* ECF 25, ¶¶ 30-31], and the plain language of those agreements confirms that the parties settled all amounts owed to one another under the MIPA, except amounts related to the Charleston 2. Having acknowledged those amounts, agreed to fixed sums in satisfaction thereof, and performed by

tendering and accepting those payments, Verde cannot now claim that the Purchase Price Adjustment was somehow miscalculated or that additional amounts remain owing. The accord and satisfaction is complete, executed, and by its express terms, a bar to all further claims on that account. *Walbridge v. Jacobs Pharmacy Co.*, 60 Ga. App. 404, 3 S.E.2d 876, 879 (1939) (an accord and satisfaction "will estop the party so receiving the money from asserting his claim to the balance"). Verde's Amended Counterclaims, which are predicated entirely on its allegation that the alleged "Great Check Exchange Program" allowed the Sellers to avoid paying Verde Outdoor the correct Net Adjustment amount," are precisely the claims that were settled, paid, and discharged. [ECF 25, ¶ 51; *compare* Ex. A-B].

Moreover, the Settlement Agreements also contain a comprehensive merger clause causing the MIPA to merge with the Settlement Agreements and extinguish the conflicting terms of the MIPA. Specifically, the Settlement Agreements provide that each Settlement Agreement constitutes:

> the **sole and entire agreement** of the parties regarding the subject matter contained herein, and **supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter**.

[Ex A, ¶ 6(h); Ex. B, ¶ 7(h) (emphasis added)]. Under the merger rule, "[a]n existing contract is superseded and discharged whenever the parties subsequently enter upon a valid and inconsistent agreement completely covering the subject-matter embraced by the original contract." *Atlanta Integrity Mortgage, Inc. v. Ben Hill United Methodist Church*, 286 Ga. App. 795, 797, 650 S.E.2d 359, 362 (2007) (citation omitted). *See also Wallace v. Bock*, 279 Ga. 744, 745, 620 S.E.2d 820 (2005). "The rational basis for the merger rule is that where parties enter into a final contract[,] all prior negotiations, understandings, and agreements on the same subject matter are merged into the final contract, and are accordingly extinguished." *Wallace*, 279 Ga. at 745, 620 S.E.2d 820 (citations and punctuation omitted.). Such a "substituted contract discharges the original duty and [a] breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty." *Id.* at 746, 620 S.E. 820 (citing Restatement, Second, Contracts, § 279(2), p. 375 (1981)). *See, e.g., Rabun & Associates*

*Const., Inc. v. Berry*, 276 Ga. App. 485, 489, 623 S.E.2d 691, 695 (2005) (finding release and settlement agreement which waived insurer's subrogation rights and contained a merger clause extinguished "all prior negotiations, understandings, and agreements on the same subject" and superseded provisions of the underlying insurance contract to the contrary).

Here, it is clear that the terms of the Settlement Agreements completely cover the same subject matter as the MIPA but are nevertheless inconsistent. The MIPA calculated the Purchase Price pursuant to an extensive formula. [*See* ECF 1-2 at Sec. 1.03(a)-(b)]. The Settlement Agreements, however, provide not for a calculation based on any formula but rather state specific and certain sums owed between the parties. Moreover, as discussed, the Settlement Agreements include explicit provisions whereby each party releases the other "from any and all claims, demands, liabilities, obligations, damages, actions, and causes of action, whether known or unknown, which exist or may exist under the [MIPA] as of the Effective Date [of the Settlement Agreements]…", specifically those pertaining to the Purchase Price Adjustment, and reserving or excluding only those involved in the Charleston 2 Dispute. [Ex. A at ¶¶3(a), 3(d)(a); Ex. B at ¶¶3(a), 4(a)].

Thus, based upon the express language of the merger clause and waiver provisions contained in the Settlement Agreements, any Post Closing Adjustment and additional funds owed between the parties were as defined in the Settlement Agreements, and the Settlement Agreements superseded any provision of the MIPA to the contrary, such that Verde cannot now bring claims against Sellers concerning the Purchase Price Adjustment under the MIPA unless such claims explicitly involve the Charleston 2 Dispute.

### C. Verde Cannot Establish A Valid Legal Basis to Rescind the Settlement Agreements.

Acknowledging that the Settlement Agreements bar the Amended Counterclaim, Verde seeks to rescind the Settlement Agreements on the grounds of fraudulent inducement. As an initial matter, "[t]he construction and enforcement of settlement agreements are governed by principles of the state's

general contracts law." *Wong v. Bailey*, 752 F.2d 619, 621 (11th Cir. 1985). As a matter of policy, Georgia law "favors compromise, and when parties have entered into a definite, certain, and unambiguous agreement to settle, it should be enforced." *Vildibill v. Palmer Johnson of Savannah, Inc.,* 244 Ga. App. 747, 748(1), 536 S.E.2d 779 (2000). Stated more directly, Georgia law favors settlements and cessation of litigation. *Dickerson v. Dickerson*, 19 Ga. App. 269, 91 S.E. 346 (1916). The 11th Circuit likewise "favor[s] and encourage[s] settlements in order to conserve judicial resources." *Murchison v. Grand Cypress Hotel Corp.,* 13 F.3d 1483, 1486 (11th Cir. 1994).

There is no dispute that the parties entered into valid and binding Settlement Agreements. To unilaterally rescind such a settlement on grounds of fraud, there must be actual as opposed to constructive fraud. *Barnett v. Speir*, 93 Ga. 762, 21 S.E. 168 (1893), *Puckett v. Reese*, 203 Ga. 716, 48 S.E.2d 287 (1948). Actual fraud requires proof of five elements: "(1) a false representation or concealment of a material fact, (2) that the defendant knew the representations or concealment were false, (3) an intent to induce the allegedly defrauded party to act or refrain from acting, (4) justifiable reliance by the plaintiff, and (5) damages as a result of the false representations or concealment." *Pacheco v. Charles Crews Custom Homes, Inc.*, 289 Ga. App. 773, 774–75, 658 S.E.2d 396, 398 (2008). If evidence as to any one of these elements is lacking, the claim for rescission fails. *Id.*

Additionally, where the alleged fraud is based on the concealment of a material fact, the party purportedly defrauded must establish that the other party had an obligation of disclosure. *See* O.C.G.A. § 23-2-52 ("Suppression of a material fact which a party is under an obligation to communicate constitutes fraud"); *accord Middleton v. Troy Young Realty, Inc.*, 257 Ga. App. 771, 772–73, 572 S.E.2d 334, 337 (2002) ("Thus, there must exist an obligation to disclose before there can be fraud by failure to communicate a material fact"). Here, Verde claims it was induced into the Settlement Agreements by Hurley's and JR Media's failure to disclose their alleged involvement in the "Great Check Exchange Program". [*See* ECF 25, ¶ 415 (defining "Falsehoods" by reference to Count 1 and Count 2)].

Assuming that this is true, Verde must first show that Hurley and JR Media had a duty to disclose before looking to whether there was a breach of this obligation. An obligation of disclosure, however, is only implied in narrow circumstances where a confidential relationship or other particular circumstances are present. *See* O.C.G.A. § 23-2-58; *accord Doe v. Saint Joseph's Catholic Church*, 313 Ga. 558, 562, 870 S.E.2d 365, 372 (2022). As to business competitors such as JR Media and Hurley and Verde, there is generally no affirmative legal duties. *See Looney v. M-Squared, Inc.*, 262 Ga. App. 499, 505, 586 S.E.2d 44, 50 (2003) ("It is difficult to imagine how [a party] owed such a duty to its competitor"). Moreover, no duty to disclose exists between parties engaged in an arms-length relationship unless there is an express contractual provision stating otherwise. *See Infrasource, Inc. v. Hahn Yalena Corp.*, 272 Ga. App. 703, 705, 613 S.E.2d 144, 146 (2005). "[I]n fact, an arm's-length relationship by its nature excludes [the existence] of a confidential relationship." *Id.* Given that Verde and Hurley and JR Media (along with other Sellers) are competitors and that the Settlement Agreements were entered into on an arm's-length basis, the only duty of disclosure that could exist would have to arise under the express language of the Settlement Agreements themselves.[7]

Verde identifies no such contractual provision that would create such an obligation. [*See* ECF 25, *generally*]. To the contrary, the Settlement Agreements are plainly devoid of any obligation requiring Hurley or JR Media disclose the nature of the conduct that Verde claims was fraudulently concealed. [*See* Ex. A, *generally*; Ex. B, *generally*]. Indeed, the only representations and warranties contained in the Settlement Agreements are found at Section 6 – none of which apply to Verde's allegations.

Furthermore, Section 7(h) contains a comprehensive merger clause which precludes Verde from relying on any warranties or representations that are not part of the Settlement Agreement. *See*

---

[7] In the absence of the Settlement Agreements, the Court's consideration would likewise be confined to the four corners of the MIPA for the same reason. The MIPA was entered into at arm's length, and Section 9.07 of the MIPA contains a comprehensive entire agreement provision. [ECF 1-2, § 9.07]. As discussed more fully below, however, no provision of the MIPA imposes any duty of disclosure or otherwise prohibits the conduct Verde contends fraudulently induced it to enter into the Settlement Agreements.

*e.g.*, *Lambert v. DMRT, LLC*, 370 Ga. App. 103, 110, 894 S.E.2d 456, 464 (2023) ("However, even assuming there was such a promise, it was nullified by the Agreement's comprehensive merger clause, as set forth above"); *Overlook Gardens Properties, LLC v. Orix, USA, LP*, 366 Ga. App. 820, 827, 884 S.E.2d 433 (2023) ("[I]f the contract contains a merger clause, a party cannot argue they relied upon representations other than those contained in the contract.") (citation and punctuation omitted). Under Georgia law, where a party affirms a contract that contains a merger or disclaimer provision, he is estopped from asserting reliance on a representation that is not part of the contract. *Novare Grp., Inc. v. Sarif*, 290 Ga. 186, 190, 718 S.E.2d 304, 309 (2011). Stated another way, the entire agreement clause operates as a disclaimer, establishing that the written agreement completely and comprehensively represents all the parties' agreement. *See e.g.*, *Premier Pediatric Providers, LLC v. Kennesaw Pediatrics, P. C.*, 373 Ga. App. 741, 747, 908 S.E.2d 368, 374 (2024), cert. denied (May 6, 2025). In short, the Settlement Agreements' merger clauses preclude reliance on representations outside of the contract as a matter of law. *Id.*

Nevertheless, Verde's own allegations demonstrate that neither Hurley nor JR Media concealed that they were paying for third parties to advertise with Verde. To the contrary, Verde admits throughout the Amended Counterclaim that it was aware Sellers were paying for third parties to advertise with Verde. [*See, e.g.,* ECF 25, ¶¶ 159-71]. Even with knowledge of such conduct, Verde **still** executed the advertising contracts. [*See, e.g.*, ECF 25, ¶ 157]. Indeed, after alleging that Hurley established Eyes on Ads, LLC to conceal that Sellers were paying for advertising purchased by third parties, Verde admits that Hurley emailed Verde from her personal email identifying Eyes on Ads, LLC as her entity; admits that each contract Verde entered into with Eyes on Ads used Hurley's Gmail address, her personal telephone number, and was personally executed by Hurley; and admits that all payments received from Eyes on Ads, LLC were from either Hurley's or her husband's American Express card. [*Id.* ¶¶ 159-71].

By admitting that it communicated with Sellers and had knowledge that they were paying for third party advertising costs, Verde admits that Sellers did not conceal their conduct from Verde. *See, e.g., Viau v. Fred Dean, Inc.*, 203 Ga. App. 801, 804, 418 S.E.2d 604, 607 (1992) ("A corporation is bound by knowledge of an officer or agent when the knowledge pertains to matters within the scope of the officer's or agent's duties").[8] "Notice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found such inquiry might have led. Ignorance of a fact, due to negligence, shall be equivalent to knowledge, in fixing the rights of the parties." *Goldman v. Hart*, 134 Ga. App. 422, 424, 214 S.E.2d 670, 673 (1975). Thus, Verde cannot plausibly claim that Sellers concealed conduct that its own allegations show was communicated to it. For the same reasons, Verde cannot demonstrate the element of justifiable reliance. *See, e.g., Lawton v. Byck*, 217 Ga. 676, 683, 124 S.E.2d 369, 374 (1962) (holding that a party with equal access to the conduct it complains of fails "to avail themselves thereof, they are not entitled to complain of the deception which they allege was practiced upon them").

### D. Verde Has Waived Any Right to Rescind the Settlement Agreements.

Even if Verde had a valid basis for rescission – which, as established above, it does not – Verde waived any such right through its own conduct. "Rescission, as a forfeiture of rights under an otherwise valid contract, is not favored under the law, and courts are quick to find that the right to rescind has been waived." *Meyer v. Waite*, 270 Ga. App. 255, 260, 606 S.E.2d 16, 21 (2004). A party who seeks to rescind a contract for fraud in the inducement "must, upon discovery of the facts, at once announce his purpose and adhere to it." *Liberty v. Storage Tr. Properties, L.P.*, 267 Ga. App. 905, 910–11, 600 S.E.2d 841, 846 (2004). If a party seeking rescission "does anything which amounts to recognition of the transaction, or acts in a manner inconsistent with a repudiation of the contract,

---

[8] Verde's allegations show that Employee No. 1 had the authority to bind Verde to advertising contracts; thus, Sellers' payment of the costs thereunder concerned matters within the scope of his duties.

such conduct amounts to acquiescence, and, though originally impeachable, the contract becomes unimpeachable in equity." *Aliabadi v. McCar Dev. Corp.*, 249 Ga. App. 309, 313, 547 S.E.2d 607, 611 (2001).

The same is true where a purchaser purports to rescind a contract without restoring the other party to its pre-contract position. *See Daly v. Mueller*, 279 Ga. App. 168, 170, 630 S.E.2d 799, 802 (2006). Indeed, the requirement of restoring the other party of whatever benefits the complaining party received under the contract "has been particularly applied to cases where[, as here,] a party seeks to rescind a release." *Id.*

> It is well established that one who, for a valuable consideration, including payment of money, has released another from all further liability, cannot obtain a rescission of such a contract of release, and recover on the original cause of action, without first restoring or offering to restore what the releasee paid for such release.

*Id.*[9]

Verde failed to comply with these requirements. First, Verde cannot be said to have asserted its intent to rescind the Settlement Agreements in a timely manner where it did not provide notice of its intent to rescind the Settlement Agreements until five (5) months after it discovered Sellers' alleged fraudulent conduct and did not file its Amended Counterclaim until seven (7) months thereafter. Such a delay does not satisfy the promptness requirement for a valid rescission. *See Conway v. Romarion*, 252 Ga. App. 528, 530–31, 557 S.E.2d 54, 57 (2001) ("An announcement of the intent to rescind the contract must be made…as soon as the facts supporting the claim for rescission are discovered"); *Orion Capital Partners, L.P. v. Westinghouse Elec. Corp.*, 223 Ga. App. 539, 543, 478 S.E.2d 382, 385 (1996) (holding that an attempt to rescind a contract approximately seven (7) months after discovery of the

---

[9] Although there are exceptions to the tender requirement, the "requirement is excused only under very narrowly defined circumstances – such as where the plaintiff is entitled to retain the benefits received notwithstanding the rescission, or where the benefits received are worthless or illusory." *Graham v. Cook*, 179 Ga. App. 603, 604, 347 S.E.2d 623, 624 (1986) (Internal citations omitted).

alleged fraud was "too late as a matter of law to constitute an effective rescission or reasonable offer to rescind the agreement").

With respect to its offer to restore, Verde failed to actually restore the benefits it received under the Settlement Agreements or otherwise make a bona fide effort to do so. Under the Settlement Agreement with Hurley, Verde was paid $1,813,362 in cash and released from a Demand Note in the principle amount of $1,013,372.53 and an Unpermitted Cash Payment in the amount of $506,686.27. [*See* Ex. A]. Under the Settlement Agreement with JR Media, Verde was paid $1,208,908 in cash and released of a Demand Note in the principal amount of $675,581.69 and an Unpermitted Cash Payment in the amount of $337,790.85. [*See* Ex. B]. Verde was therefore required to refund *at least* these amounts to Petitioners at the time it attempted to rescind the Settlement and Release Agreements, and its failure to do so bars its recission attempts. *See Leathers v. Robert Potamkin Cadillac Corp.*, 184 Ga. App. 430, 431, 361 S.E.2d 845, 846 (1987) (A party "cannot obtain a rescission of such a contract of release, and recover on the original cause of action, without first restoring or offering to restore what the releasee paid for such release").

## II.     Verde's Claims Are Precluded by the Plain Language of the MIPA.

Notwithstanding the preclusive effect of the Settlement Agreements, Verde's Amended Counterclaims are nonetheless precluded by the plain language of the MIPA. Each of Verde's new claims rest solely upon Verde's allegation that "Sellers formulated a scheme and artifice to defraud Verde Outdoors (and Verde Outdoor SE), an object of which was to avoid compliance with their legal obligations under the Net Adjustment provision of the [MIPA]…preventing Verde Outdoors from collecting money they owed it." [*Id.* at ¶ 73; *see also id.* at ¶ 34]. Verde must therefore show that Sellers deprived Verde of money it was owed under the Net Adjustment provision of the MIPA.

Attempting to show it was deprived of money under the MIPA, Verde alleges that Sellers, by paying third parties to advertise with Verde, "falsely inflat[ed] the Actual BCF for the True-Up Sites

during the True-Up Period[.]" [*Id.* at ¶ 50]. Verde does not claim that the Actual BCF was falsely inflated because it did not actually receive the revenue from the advertising contracts entered into with the third parties. [*Id.*, *generally*]. Instead, Verde claims the Actual BCF was artificially inflated because:

> The [third parties] often only advertised on the True-Up Sites during the True-Up Period. The [third parties], therefore, were not going to renew their advertising agreements when they expired because their advertising costs would not be paid for or reimbursed by Sellers after the True-Up Period ended. This means the money apparently generated from the True-Up Sites during the True-Up Period was neither real nor genuine revenue and thus not representative of the True-Up Sites's past or possible future performance in generating revenue.

[*Id.* at ¶ 46].

Nothing in the MIPA, however, supports Verde's claim that the revenue generated from the advertising contracts allegedly paid for by Sellers was not real or genuine. Actual BCF is defined as "the actual billboard cash flow for each such [Permitted Development Site and Unpermitted Development Site] for twelve (12) full calendar months of operation[.]" [*Id.*] Outside of this definition, the MIPA contains no qualification excluding revenue from the Actual BCF based on the identity of the advertiser, the source of the advertiser's funds, or the advertiser's likelihood of renewal after the True-Up Period. Actual BCF is simply the "actual billboard cash flow" received during the defined period. Verde received such revenue from the third parties, and nothing in the MIPA's definition renders that revenue fictitious, artificial, or otherwise excludable from the Actual BCF. Verde's theory that revenue from the third-party advertisers was "not real or genuine" because those advertisers may not have renewed is not supported by the plain language of the MIPA.

Similarly, after alleging that the revenue generated from the third parties not real or genuine, Verde, without referencing MIPA, asserts that such advertising contracts "were not entered into: (1) in the ordinary course of Verde Outdoor SE's business; (2) at generally prevailing market rates; or (3)

Page 22 of 26

on an arm's length basis, on market terms and market rates."[10] [*See, e.g.*, ECF 25, ¶ 47]. These three elements Verde continually implies are relevant to its claims actually mirror representations made by Sellers in Section 2.16(a) of the MIPA. [*See* ECF 1-2, Sec. 2.16(a)]. Verde never explicitly references Section 2.16(a) of the MIPA because those representations were temporally limited "**as of the Effective Date**" and "**as of the Closing**." [*See id.* at Sec. 2.01]. The MIPA contains no language extending these representations post-Closing, and nowhere else in the MIPA are there any post-Closing obligations imposed on Sellers. [*See id.*, *generally*].

Accordingly, Verde is asking the Court to rewrite and restrict the definition of Actual BCF and impose post-Closing representations and warranties on Sellers that do not exist under the plain language of the MIPA. But, the failure to restrict the definition of Actual BCF and extend the representations and warranties post-Closing were both a "considered choice" of the parties under Georgia law. The MIPA was a heavily negotiated agreement between sophisticated commercial parties, each represented by counsel, memorializing a significant transaction. The parties demonstrated throughout that they knew precisely how to define key terms and impose post-Closing obligations when they intended to do so. Where "the bargain is the result of elaborate negotiations in which the parties are aided by counsel…it is easier to assume that a failure to make provision in the agreement resulted not from ignorance of the problem, but from an agreement not to require it." *WirelessMD, Inc. v. Healthcare.com Corp.*, 271 Ga. App. 461, 467, 610 S.E.2d 352, 358 (2005). And, when a sophisticated party has demonstrated its know-how but has nevertheless elected to exclude provisions from a contract or refrain from having a party sign certain related documents, such decision should be treated as a matter of considered choice evidencing the intent of the parties. *See Flynt v. Life of S.*

---

[10] Notably, if the advertising contracts Verde entered with third parties were not at prevailing market rates or on market terms, that fact would have been apparent from the face of the contracts. Verde therefore had notice of the alleged conduct and, as set forth above, is precluded from relying on those contracts to support its claims for fraud. *See Goldman*, 134 Ga. App. at 424, 214 S.E.2d at 673.

*Ins. Co.*, 312 Ga. App. 430, 436, 718 S.E.2d 343, 348 (2011) (insurer "demonstrated that if it wanted to restrict the effective date of a policy provision, it knew how to do so; its failure to do so with regard to the incontestability clause thus should be treated as a matter of considered choice").

Because the MIPA neither restricts the definition of Actual BCF to exclude advertiser-subsidized revenue nor prohibits Sellers from paying third parties to advertise on Verde's billboard sites during the True-Up Period, Verde's allegation that Sellers falsely inflated the Actual BCF fails. Without a false inflation of the Actual BCF, there is no fraud. Without fraud, there are no predicate acts of mail fraud, wire fraud, or theft by taking, and Verde's RICO claim fails as a matter of law. *See Orix, USA, LP*, 366 Ga. App. at 834–35, 884 S.E.2d at 447 ("[W]hen the underlying actions upon which a RICO claim is premised fail, the RICO claim likewise fails as a matter of law."). Verde's remaining claims for fraud, money had and received, and aiding and abetting are derivative of the same deficient theory and fail for the same reason.

### III.   Verde's Claims Are Further Precluded by Its Admissions That It Was Aware And Participated in the Very Fraud On Which It Bases Its Claims.

As set forth above, Verde's claims all rest on its allegation that Sellers defrauded it of a benefit under the MIPA. [*See e.g.,* ECF 25, ¶ 34]. Thus, Verde must not only establish that it was deprived of a benefit to which it was entitled under the MIPA – which, as shown above, it cannot – it must also establish that it was defrauded of this benefit, assuming one existed. By Verde's own allegations, however, it admits it was aware and participated in the very scheme it claims constitutes fraud and therefore cannot meet the essential elements of an actual concealment of material fact or justifiable reliance.

Specifically, Verde admits that its own employees solicited the third-party advertisers, introduced them to Sellers, and executed the advertising contracts on Verde's behalf. [ECF 25, ¶ 71]. More significantly, despite claiming that Sellers used Eyes on Ads, LLC to conceal their identities as the party funding the third-party advertising, Verde admits that Hurley emailed Verde directly from

her personal email identifying Eyes on Ads, LLC as her own entity; admit that every contract Verde entered into with Eyes on Ads used Hurley's Gmail address and personal telephone number and was personally executed by Hurley; and admits that every payment Verde received from Eyes on Ads came from Hurley's or her husband's American Express card. [Id. at ¶¶ 159-71]. In other words, by Verde's own account, Sellers' identity was apparent from every communication, every contract, and every payment. There was no concealment. Where a party's own agents participated in the alleged conduct and the party communicated directly with the alleged wrongdoers, the elements of concealment and justifiable reliance cannot be established as a matter of law. *See Viau v. Fred Dean, Inc.*, 203 Ga. App. 801, 804, 418 S.E.2d 604, 607 (1992) ("A corporation is bound by knowledge of an officer or agent when the knowledge pertains to matters within the scope of the officer's or agent's duties"); *Goldman*, 134 Ga. App. at 424, 214 S.E.2d at 673 ("Ignorance of a fact, due to negligence, shall be equivalent to knowledge, in fixing the rights of the parties"); *Lawton v. Byck*, 217 Ga. 676, 683, 124 S.E.2d 369, 374 (1962) (a party with equal access to the facts it complains of is not entitled to claim deception). Verde's fraud claim therefore fails on its face, and because Verde's RICO, money had and received, and aiding and abetting claims are all derivative of the same theory, they fail for the same reason.

## CONCLUSION

For all of these reasons, Hurley, Jones, and JR Media respectfully request that the Court dismiss Verde's claims for RICO (Count 1), fraud (Count 8), money had and received (Count 9), aiding and abetting (Count 11), and rescission of the Settlement Agreements (Counts 12 and 13), together with such other and further relief as the Court deems just and proper.

**ROBERTS TATE, LLC**

*/s/ Jason M. Tate*
Jason M. Tate
Georgia Bar No. 140827
James L. Roberts, IV
Georgia Bar No. 608580
*Attorney for Petitioners*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 23rd day of March, 2026, I electronically filed the foregoing

**PARTIAL MOTION TO DISMISS AMENDED COUNTERCLAIM** with the Clerk of Court

using the CM/ECF system, which will send notification of such filing to all attorneys of record.

Respectfully submitted this 23rd day of March, 2026.

**ROBERTS TATE, LLC**

/s/ Jason M. Tate
Jason M. Tate