**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| JR MEDIA CO., LLC and CHRISTA HURLEY, <br><br>     *Plaintiffs,* <br><br> v. <br><br> VERDE OUTDOOR MEDIA, LLC, <br><br>     *Defendant,* <br><br> - and - <br><br> VERDE OUTDOOR MEDIA, LLC, and VERDE OUTDOOR SE, LLC, <br><br>     *Counterclaim Plaintiffs,* <br><br> v. <br><br> JOHN E. RENFROE, CHRISTA R. HURLEY, MARCUS BENJAMIN JONES, and JR MEDIA CO., LLC, <br><br>     *Third-Party Counterclaim Defendants.* | Civil Action No. <br> 2:25-CV-036 |

**THIRD-PARTY COUNTERCLAIM DEFENDANT JOHN E. RENFROE'S
PARTIAL MOTION TO DISMISS VERDE'S AMENDED COUNTERCLAIM**

Third-Party Counterclaim Defendant John E. Renfroe ("Jed Renfroe"), pursuant to Fed. R. Civ. P. 12 (b)(6), moves this Court for a dismissal of Counts 1, 2, 5, 6, 7, 8, 9 and 10 of Verde Outdoor Media, LLC's and Verde Outdoor SE, LLC's (collectively, "Verde") Amended Counterclaim. In support thereof, Defendant Renfroe shows this Court the following.

1

## I. <u>Introduction</u>

Despite its sweeping allegations of fraud, abuse, and corruption, the Amended Counterclaim is in reality nothing more than an attempt to repackage barred breach-of-contract claims under different theories of liability. In short, Verde believes that Sellers[1] deprived it of monies owed under a complex contract entered into in connection with the sale of multiple entities controlled by Sellers. What Verde's Amended Counterclaim largely sidesteps the substance of is that the amounts owed under this contract—the Membership Interest Purchase Agreement—were fiercely negotiated for nearly a year before the parties, that is, Verde, Hurley, and JR Media, entered into separate Settlement Agreements and Releases between December 17, 2024, and January 8, 2025 (collectively, the "Settlement Agreements").

The language of the Settlement Agreements could not be plainer. Verde, on behalf of itself and its successors, assigns, agents, representatives, and any other person or entity acting on its behalf, released:

> [JR Media and Hurley], and their respective successors, assigns, agents, representatives, and any other person or entity acting on [their] behalf, from any and all claims, demands, liabilities, obligations, damages, actions, and causes of action, whether known or unknown, which exist or may exist under the Purchase Agreement as of the Effective Date but only with respect to: (a) the Purchase Price Adjustment described in this Agreement, excluding the Charleston 2 Dispute; (b) the Closing Prorations; and (c) the CapEx Funds . . .

*See* Exhibit 1 at ¶¶ 3 (a), 4 (a); *see also* Exhibit 2 at ¶¶ 3 (a), 3 (d)(a). With the exception of Counts 3 and 4 (which relate to the Charleston 2 Dispute, and which are not

---

[1] That is, Christa Hurley, JR Media Co., LLC, Jed Renfroe, and A.P.E. Holdings, LLC.

challenged by this Motion to Dismiss) the entirety of the Amended Counterclaim is concerned with the "Purchase Price Adjustment." *See generally* doc. 25. As a result, the language of the Settlement Agreements encompasses the claims that Verde now asserts and bars them as a matter of law.

Understanding this reality, Verde spins a lengthy tale that Sellers collectively and Renfroe individually defrauded it by financing advertising contracts purchased with Verde by various charitable organizations to artificially inflate the revenues considered as part of the Purchase Price Adjustment. In doing so, Verde seeks to assert claims for violations of Georgia's Racketeer Influenced and Corrupt Organizations Act ("RICO"), fraud, money had and received, breach of agreement, and recission of the Settlement Agreements, all of which are predicated on Verde's theory of Sellers' and Renfroe's fraud by concealment, the idea being that these claims escape the Settlement Agreements' proscription by bringing in claims against new parties (such as Renfroe) or by rendering the Settlement Agreements void altogether.

The issue with Verde's Amended Counterclaim when it comes to Defendant Renfroe is that Verde has not adequately alleged the predicate act of fraud by concealment which is the driving force of its claims against him. Even assuming, without conceding, that Renfroe had a duty to disclose material facts to Verde by virtue of his relationship with it, Verde's own Amended Counterclaim alleges that Renfroe made such disclosures. Verde alleges that Renfroe and other Sellers were in constant communication with Verde's agents and employees about the source of the funds for the advertising contracts at issue. That knowledge alone defeats Verde's claim for fraud

3

by concealment. And even if that were not the case, and the Court were to find that Verde has adequately alleged concealment of material facts, Verde still cannot establish fraud by concealment because it (1) cannot show justifiable reliance and (2) said claims are precluded by the plain language of the Membership Interest Purchase Agreement.  Specifically, Verde must ask the Court to rewrite and restrict definitions in the Purchase Agreement between the parties to include imposing post-Closing representations and warranties on Sellers (including Renfroe) that do not exist under the plain language of the Purchase Agreement in order for its claims to survive.

As a result, and irrespective of the Settlement Agreements, Verde's claims against Renfroe related to the Purchase Price Adjustment provision of the Membership Interest Purchase Agreement fail. Accordingly, Renfroe requests that those claims—Counts 1, 2, 5, 6, 7, 8, 9 and 10 of Verde's Amended Counterclaim—be dismissed.[2]

## II. <u>Summary of Facts and Allegations</u>

This case arises from a contract known as the Membership Interest Purchase Agreement (the "Purchase Agreement") entered into between Verde as Buyer and Christa Hurley, JR Media Co., LLC, Jed Renfroe, and A.P.E. Holdings, LLC as Sellers. *See generally* doc. 1-2. Prior to the Purchase Agreement, Defendant Renfroe, JR Media, and APE owned all the membership interests in the two limited liability

---

[2] Renfroe has not filed an Answer contemporaneously with this Partial Motion to Dismiss because, as this Court has previously found, the filing of a partial motion to dismiss tolls the time in which a party is required to file an answer under Rule 12 (a). *See Dotson v. DISH Network, LLC*, No. 2:19-CV-21, 2019 WL 3483806, at *3 (S.D. Ga. July 31, 2019).

companies that owned and operated the outdoor billboards which are the subject of this case (the "Businesses"). *See* doc. 25 at ¶¶ 12–13. On or about October 29, 2021, Verde entered into the Purchase Agreement with Sellers for the purchase of all of the membership interests in the Businesses held by Hurley, JR Media, and APE, and a portion of the membership interests in the Businesses held by Defendant Renfroe. *Id.* at ¶¶ 15–16. On the Closing Date—October 29, 2021[3]—Verde acquired eighty-five percent of the membership interests in the Businesses, and Defendant Renfroe held the remaining fifteen percent. *Id.* at ¶ 16.

Under the Purchase Agreement, the Purchase Price for Sellers' membership interests in the Businesses was calculated upon: (1) a 10-times multiple of the actual cash flow ("Actual BCF") of the outdoor billboards in operation as of the Closing Date (the "Existing Sites"); (2) a 10-times multiple of the estimated cash flow ("Estimated BCF") of outdoor billboards permitted for development as of the Closing Date (the "Permitted Development Sites"); and (3) an 8-times multiple of the Estimated BCF of outdoor billboards expected to be permitted for development within six months and operational within twelve months following the closing date (the "Unpermitted Development Sites"). *See* doc. 1-2 at Sec. 1.03(a); *see also* doc. 25 at ¶¶ 18–20. With respect to the Permitted Development Sites and Unpermitted Development Sites, the Purchase Agreement provided for certain "Post-Closing Adjustments" to the Purchase Price. *See* doc. 1-2 at Sec. 1.03(b); *see also* doc. 25 at ¶ 21. Put simply, if the

---

[3] *See* doc. 1-2 at Sec. 1.04 ("The closing of the transaction contemplated by this Agreement (the "Closing") shall take place remotely via electronic exchange of documents and signatures on October 29, 2021 (the "Closing Date")).

Estimated BCF for any Permitted Development Site or Unpermitted Development Site differed from the structure's actual cash flow after twelve full calendar months of operation, the Purchase Price for that structure would be adjusted to reflect its Actual BCF. *Id.*

When it came time for the Post-Closing Adjustments to the Purchase Price to be made, there was a dispute between the Sellers and Verde concerning the extent and amount of the Post-Closing Adjustments. *See* doc. 25 at ¶¶ 30–31. Following nearly a year of negotiations, during which Sellers and Verde were represented by legal counsel, Sellers and Verde entered into a Settlement Agreement and Release with JR Media and Hurley (collectively, the "Settlement Agreements"), copies of which are attached hereto as Exhibit 1 and Exhibit 2, respectively. Pursuant to the Settlement Agreements, Verde, on behalf of itself and its successors, assigns, agents, representatives, and any other person or entity acting on its behalf, released:

> [JR Media and Hurley], and their respective successors, assigns, agents, representatives, and any other person or entity acting on [their] behalf, from any and all claims, demands, liabilities, obligations, damages, actions, and causes of action, whether known or unknown, which exist or may exist under the Purchase Agreement as of the Effective Date but only with respect to: (a) the Purchase Price Adjustment described in this Agreement, excluding the Charleston 2 Dispute; (b) the Closing Prorations; and (c) the CapEx Funds . . .

*See* Exhibit 1 at ¶¶ 3 (a), 4 (a); *see also* Exhibit 2 at ¶¶ 3 (a), 3 (d)(a).

After the execution of the Settlement Agreements, on January 21, 2025, Hurley and JR Media filed the instant action against Verde in State Court, asking the Court to interpret and apply specific language in the Purchase Agreement in connection with the Charleston 2 Dispute. *See generally* doc. 1-1. Verde thereafter removed the

6

present action to this Court on March 10, 2025, *see* doc. 1, and on March 17, 2025, filed its Answer and original Counterclaim related solely to the Charleston 2 Dispute. *See generally* doc. 4.

After filing its Answer and Counterclaim, Verde contends that in or around July 2025 it became aware that Sellers had engaged in a purported scheme to artificially inflate the Actual BCF for the Permitted Development Sites and Unpermitted Development Sites in order to avoid their obligations under the Net Adjustment provisions of the Purchase Agreement and deprive Verde of monies it claims it was owed thereunder. *See, e.g.*, doc. 25 at ¶¶ 49, 73. Specifically, Verde alleges that, following the closing of the Purchase Agreement and prior to the execution of the Settlement Agreements, it entered into agreements with certain charities to advertise on the Permitted Development Sites and Unpermitted Development Sites; that, unbeknownst to Verde, Sellers were either directly or indirectly fronting the costs of such advertising by making donations to those charities; and that Sellers fraudulently concealed the fact that they were donating to those charities to advertise with Verde in order to unlawfully take and misappropriate monies rightfully belonging to Verde under the Purchase Agreement. *See, e.g., id.* at ¶¶ 42–43, 415.

Approximately five months after Verde's alleged discovery of the purported scheme, Verde notified Sellers that it was unilaterally rescinding the Settlement Agreements based upon their alleged failure to disclose that they were donating to the various charities to cover the costs associated with the advertising. *Id.* at ¶¶ 30–31. Then, on February 11, 2026, now seven months following Verde's alleged

discovery of the purported scheme, Verde filed its Amended Counterclaim, asserting claims against Sellers collectively and Renfroe individually for, among other things, violations of Georgia's RICO Act (Counts 1 and 2); breach of contract (Counts 5 and 6); money had and received (Counts 7 and 9); fraud (Count 8); and breach of duties (Count 10). *See generally id.* These claims are premised solely upon Sellers' (and Renfroe's) purported failure to disclose that they were making charitable donations to cover the costs associated with the various charities' advertising contracts, which Verde self-proclaims as fraud. *Id.* As discussed below, those claims fail as a matter of law; thus, Renfroe requests that those claims be dismissed.

### III. <u>Dismissal Standard</u>

Like a complaint, a counterclaim must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8 (a)(2). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a counterclaim must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570).

This standard requires that the factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere

8

conclusory statements, do not suffice." *Id.* Further, a legal conclusion, including one couched in factual allegation, need not be accepted as true on a motion to dismiss. *Id.* Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the plaintiff's burden, as mere consistency does not establish plausibility of entitlement to relief, even if it supports the possibility of relief. *Id.*

In determining whether a counterclaim is sufficient under the standards of *Iqbal* and *Twombly*, it often is appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. Identifying and setting aside such allegations is crucial, because they simply do not count toward showing plausibility of entitlement to relief. As suggested above, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations—plausibly allege an entitlement to relief. *Id.* If not, the pleading fails to meet the standard set forth in Rule 8 and must be dismissed under Fed. R. Civ. P. 12(b)(6). *Id.* at 683.

Finally, when assessing the sufficiency of a counterclaim on a motion to dismiss, a district court has some discretion to decide whether to consider matters outside of the pleadings. *See Jackson v. City of Atlanta*, 97 F.4th 1343, 1350 (11th Cir. 2024). Extrinsic material that is referenced in the operative complaint and attached to a motion to dismiss may be considered by the court at the pleading stage if the attached material is (1) central to the plaintiff's claims and (2) the authenticity of the document is not challenged. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

## IV. <u>Argument</u>

**A.**     *Irrespective of the Settlement Agreements, the majority of Verde's claims fail because Verde's underlying fraud claim fails.*

With respect to its claims for violations of Georgia's RICO Act (Counts 1 and 2); breach of contract (Counts 5 and 6); money had and received (Counts 7 and 9); fraud (Count 8); and breach of duties (Count 10), Verde alleges that Sellers collectively and Renfroe individually committed the predicate acts of mail fraud, wire fraud, and theft by taking. *See, e.g.,* doc. 25 at ¶ 64. Mail and wire fraud occurs "when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *See Z-Space, Inc. v. Dantanna's CNN Ctr., LLC*, 349 Ga. App. 248, 254 (2019). Similarly, the predicate act of theft by taking requires an unlawful taking or appropriation. *See* O.C.G.A. § 16-8-2. So, if Sellers' (or Renfroe's) alleged concealment of their payment of various charities' advertising costs—the purportedly illegal act here—does not constitute fraud, then Defendant Renfroe did not commit the predicate acts of mail fraud, wire fraud, or theft by taking and Verde's RICO claims fail as a matter of law. *See Overlook Garden Props., LLC v. Orix, USA, LP*, 366 Ga. App. 820, 834–35 (2023) ("Under Georgia law, when the underlying actions upon which a RICO claim is premised fail, the RICO claim likewise fails as a matter of law.").

       **i.**     *Even taking Verde's allegations as true, Renfroe concealed no material facts that would give rise to a fraud by concealment claim.*

To sustain a claim for fraud, a plaintiff must satisfy five elements: (1) a false representation or concealment of a material fact; (2) that the defendant knew the

10

representation or concealment were false; (3) an intent to induce the allegedly defrauded party to act or refrain from acting; (4) justifiable reliance by the defrauded party; and (5) damages as a result of the false representation or concealment. *See Pacheo v. Charles Crews Custom Homes, Inc.*, 289 Ga. App. 773, 775 (2008). Even assuming that Renfroe was bound by an obligation of disclosure by virtue of his role in Verde,[4] Verde cannot establish at least two of these essential elements. First, Verde's own allegations demonstrate that Renfroe did not conceal the advertising contracts Verde entered into with various charities, or the substance of how those contracts were being funded, which means that the first element is not satisfied. Throughout the Amended Counterclaim, Verde admits that multiple of its employees and agents, one of whom it refers to as "Employee No. 1," were involved in numerous communications[5] with Hurley, Jones, JR Media, and Renfroe concerning the specifics execution of these advertising contracts of behalf of Verde. *See, e.g.,* doc. 25 at ¶ 157. By admitting that Employee No. 1, along with its other agents and employees, communicated with Renfroe and had knowledge that Renfroe (and other Sellers) were making donations to charities who were entering into these contracts, Verde concedes that Renfroe did not conceal his conduct from Verde. *See, e.g., Viau v. Fred Dean, Inc.*, 203 Ga. App. 801, 804 (1992) ("A corporation is bound by knowledge of an officer or

---

[4] As other Sellers have argued in their Motion to Dismiss, no contractual obligation of disclosure arose under the Purchase Agreement.

[5] Employee No. 1, upon information and belief, was a management-level employee at Verde.

agent when the knowledge pertains to matters within the scope of the officer's or agent's duties.").[6]

That is not speculation. Verde outright alleges that Sellers disclosed they were fronting the costs for the charities' advertising by making donations to the same. For example:

> On or about February 15, 2023, Jed Renfroe exchanged a series of text messages with Employee No. 1 about soliciting charities to participate in the Check Exchange Program. In these text messages, Jed Renfroe answered questions from Employee No. 1 and explained how the Check Exchange Program would work:

>> [Employee No. 1:] No problem. Language on contract for United Way saying contributor to pay okay or how do you want to handle that? Bob getting contract filled out and going to UW meeting today for signature.

>> [Renfroe:] We need the 501-c-3 number and address of where to send checks.

>> [Employee No. 1:] So we are giving them the money to pay us correct?

>> [Renfroe:] Yes.

>> [Employee No. 1:] Can we put verbiage on the contract like the will not have to pay or an addendum that says they won't have to pay the bill.

>> [Renfroe:] No they need to pay. We are going to send donate them the money to pay the monthly invoice.

---

[6] The requirement referenced in *Viau* is satisfied by Verde's allegations that Employee No. 1 had the authority to bind Verde to advertising contracts. Thus, Renfroe's payment of the costs arising under such contracts concerned matters within the scope of Employee No. 1's duties.

*See* doc. 25 at ¶ 88. This is not an isolated incident. The Amended Counterclaim is replete with examples of such communications between Renfroe (and other Sellers) and agents and employees of Verde disclosing that he and Sellers were making donations to the various charities to cover their advertising costs. *See, e.g., id.* at ¶¶ 100, 110, 158–160, 285–286, 294, 296.

Verde gives special attention to an entity called Eyes on Ads, LLC, which Verde claims was "created to act as a middleman, concealing from Verde the fact that Sellers were either paying directly or indirectly for advertising purchased by Eyes on Ads' supposed customers [(*i.e.*, certain charities)]." *Id.* at ¶ 162. That allegation does not stand up to scrutiny. The information concerning the formation of Eyes on Ads and the role it would play in purchasing advertising contracts for various charities was directly conveyed to Verde. *Id.* at ¶¶ 159–160. In short, Verde's own allegations show that Hurley (who is Renfroe's sister) personally e-mailed Verde identifying Eyes on Ads as her entity and that Verde responded to that e-mail by sending the advertising contracts that Sellers (including Renfroe) were allegedly paying for. *Id.* at ¶¶ 156–210. Moreover, Verde admits that "[e]ach of the sixteen contracts entered into by Eyes on Ads on behalf of its purported customers used Hurleys Gmail address and it appears her personal telephone number[,]" and further that "all of the payments made by Eyes on Ads on behalf of King Realtors, Pixie Planners and Wisdom Girls were charged either to Christa Hurley's American Express card or the American Express card held by her husband, Cory Hurley." *See generally id.* In other words, Verde's own allegations show that this conduct was not concealed.

13

The above is just a sampling. According to Verde's Amended Counterclaim, Verde's employees and agents, including those with the authority to bind Verde to advertising contracts within the scope of their duties, were consistently made aware of and agreed to the (1) the advertising contracts entered into between Verde and various charities and (2) the source of funding for those advertising contracts. That is direct communication, not concealment. And that lack of concealment in the first instance means that Verde cannot satisfy an essential element of its fraud by concealment claim. *Viau*, 203 Ga. App. at 804. Coming back after the fact to allege that Renfroe has committed egregious fraudulent acts after raising no objections during the operative times of these contracts is itself dubious at best and suggests other motivations for this current lawsuit.[7]  As a result, all claims predicated upon that theory of fraud by concealment necessarily fail and should be dismissed.

### ii.    *Verde has not adequately asserted justifiable reliance.*

Even assuming, arguendo, that Verde could show Defendant Renfroe owed it a duty to disclose that he was making donations to cover the costs of the various charities' advertising purchases, and that Defendant Renfroe concealed this fact in

---

[7] On March 5, 2026, a popular industry news magazine/website published an article about this case, and, specifically, about Verde's newly filed counterclaims.  The title of the article is "The World of OOH Advertising Meets Crime, Corruption and a Whole Lot of Checks- And Not the Kind You Want to Cash."  https://oohtoday.com/the-world-of-ooh-advertising-meets-crime-corruption-and-a-whole-lot-of-checks-and-not-the-kind-you-want-to-cash/.  To call the title provocative and/or salacious are understatements.  The article begins, "A few weeks ago, I received an anonymous email."  The article goes on to discuss Verde's newfound claims.  It is unclear who the "source" of this email was.  It is clear that if it was a party, the same was a violation of this Court's longstanding rule. See, S.D. Ga. Civil L.R. 11.2; *see generally Lott v. Estes*, No. 4:22-CV-123, 2023 WL 4278688, at *5–7 (S.D. Ga. June 29, 2023).

violation of said duty, Verde still cannot establish an essential element of fraud: justifiable reliance. Verde's theory is that that Sellers (and Renfroe) secretly paid for advertising purchased by the charities in order to increase Verde's revenue and thereby artificially inflate the Post-Closing Adjustments to the Purchase Price. *See generally* doc. 25. To show justifiable reliance under these facts, then, Verde must show that it would not have entered into the advertising contracts at issues had it known that Sellers (and Renfroe) were subsidizing the advertising costs by making donations to charitable organizations. That is inconsistent with Verde's own theory of the case. Refusing to enter into those contracts would have reduced Verde's revenue and thereby altered the Post-Closing Adjustments to the Purchase Price in precisely the manner Verde claims Sellers (and Renfroe) wrongfully manipulated them. Thus, in order to establish justifiable reliance, Verde must show that it would have taken the very action that would have produced the outcome it now characterizes as wrongful. That circular logic is unavailing.

Moreover, the facts alleged by Verde cannot establish the element of justifiable reliance because, at a minimum, it has failed to demonstrate that it exercised due diligence. Fraud cannot be the basis of an action if:

> [I]t appears that the party alleging the fraud had an equal and ample opportunity to prevent it and yet made it possible through the failure to exercise due diligence. When the means of knowledge are at hand and equally available to both parties to a contract of sale, if the purchaser does not avail himself of these means, he will not be heard to say, in impeachment of the contract, that he was deceived by the representations of the seller.

*See Middleton v. Troy Young Realty, Inc.,* 257 Ga. App. 771, 773 (2002). Here, the advertising contracts Verde claims were fraudulently procured were executed and entered into by Verde itself. An unnamed employee of Verde (aside from Employee No. 1) is alleged to have signed many of the advertising contracts. *See, e.g.,* doc. 25 at ¶¶ 104, 120, 229—234, 324. Further, Hurley's signature appears on several of the advertising contracts and reflect that she executed them in her capacity for one or more of the advertising customers. *See, e.g., id.* at ¶¶ 171, 176–177, 180–188, 194–198. Accordingly, Verde did not merely have the opportunity to conduct due diligence into its customers' relationship with Renfroe and the other Sellers; it was affirmatively placed on notice that such a relationship existed by the presence of Hurley's signature on the contracts themselves. As *Middleton* instructs, Verde's decision not to avail itself of information that was not only readily accessible but plainly apparent prohibits Verde from asserting fraud claims on the basis on alleged nondisclosure. To argue otherwise would require Verde to take the untenable position that, despite being a party to the advertising contracts and knowing that one of the Sellers under the Purchase Agreement was executing advertising contracts on behalf of the same entities Verde characterizes as "strawmen," Verde nonetheless lacked sufficient access to information or means of knowledge to determine whether those customers had a relationship with Renfroe and the other Sellers.

As such, Verde has not and cannot establish the element of justifiable reliance in support of its theory of fraud by concealment. Thus, Verde's theory of fraud fails

16

as a matter of law and the claims that are derived from it also necessarily fail and should be dismissed.

### iii.    *Verde's claims are precluded by the plain language of the Purchase Agreement.*

Finally, Verde's claims against Renfroe are precluded by the plain language of the Purchase Agreement itself. Verde's claims rest upon the allegation that "Sellers formulated a scheme and artifice to defraud Verde Outdoors (and Verde Outdoor SE), an object of which was to avoid compliance with their legal obligations under the Net Adjustment provision of the [Purchase Agreement] . . . preventing Verde Outdoors from collecting money they owed it." *See* doc. 25 at ¶¶ 34, 73. Verde must therefore show that Sellers (including Renfroe) deprived Verde of money it was owed under the Net Adjustment provision of the Purchase Agreement.

Attempting to show it was deprived of money under the Purchase Agreement, Verde alleges that Sellers (including Renfroe), by making donations to certain charitable organizations cover costs of advertising with Verde, "falsely inflat[ed] the Actual BCF for the True-Up Sites during the True-Up Period[.]" *Id.* at ¶ 50. Verde does not claim that the Actual BCF was falsely inflated because it did not actually receive the revenue from the advertising contracts entered into with the third parties. *See generally id.* Instead, Verde claims the Actual BCF was artificially inflated because:

> The [third parties] often only advertised on the True-Up Sites during the True-Up Period. The [third parties], therefore, were not going to renew their advertising agreements when they expired because their advertising costs would not be paid for or reimbursed by Sellers after the True-Up Period ended. This means the money apparently generated from the True-Up Sites during the True-Up Period was neither real nor

> genuine revenue and thus not representative of the True-Up Sites's past or possible future performance in generating revenue.

*See id.* at ¶ 46.

Nothing in the Purchase Agreement, however, supports Verde's claim that the revenue generated from the advertising contracts allegedly paid for by Sellers' charitable donations was not real or genuine. Actual BCF is defined as "the actual billboard cash flow for each such [Permitted Development Site and Unpermitted Development Site] for twelve (12) full calendar months of operation[.]" *Id.* Outside of this definition, the Purchase Agreement contains no qualification excluding revenue from the Actual BCF based on the identity of the advertiser, the source of the advertiser's funds, or the advertiser's likelihood of renewal after the True-Up Period. Actual BCF is simply the "actual billboard cash flow" received during the defined period. Verde received such revenue from the third parties, and nothing in the Purchase Agreement's definition renders that revenue fictitious, artificial, or otherwise excludable from the Actual BCF. Verde's theory that revenue from the charitable organization advertisers was "not real or genuine" because those advertisers may not have renewed is not supported by the plain language of the Purchase Agreement.

Similarly, after alleging that the revenue generated from the third-parties is not real or genuine, Verde, without referencing the Purchase Agreement, asserts that such advertising contracts "were not entered into: (1) in the ordinary course of Verde Outdoor SE's business; (2) at generally prevailing market rates; or (3) on an arm's

18

length basis, on market terms and market rates."[8] *See, e.g.,* doc. 25 at ¶ 47. These three elements Verde continually implies are relevant to its claims actually mirror representations made by Sellers in Section 2.16(a) of the Purchase Agreement. *See* doc. 1-2 at Sec. 2.16(a). Verde never explicitly references Section 2.16(a) of the Purchase Agreement because those representations were temporally limited "as of the Effective Date" and "as of the Closing." *See id.* at Sec. 2.01. The Purchase Agreement contains no language extending these representations post-Closing, and nowhere else in the Purchase Agreement are there any post-Closing obligations imposed on Sellers. *See generally id.*

Accordingly, Verde is asking the Court to rewrite and restrict the definition of Actual BCF and impose post-Closing representations and warranties on Sellers (including Renfroe) that do not exist under the plain language of the Purchase Agreement. But the failure to restrict the definition of Actual BCF and extend the representations and warranties post-Closing were both a "considered choice" of the parties under Georgia law. The Purchase Agreement was a heavily negotiated contract between sophisticated commercial parties, each represented by counsel, memorializing a significant transaction. The parties demonstrated throughout that they knew precisely how to define key terms and impose post-Closing obligations when they intended to do so. Where "the bargain is the result of elaborate negotiations in which

---

[8] Notably, if the advertising contracts Verde entered with third parties were not at prevailing market rates or on market terms, that fact would have been apparent from the face of the contracts. Verde therefore had notice of the alleged conduct and, as set forth above, is precluded from relying on those contracts to support its claims for fraud. *See Goldman,* 134 Ga. App. at 424.

the parties are aided by counsel…it is easier to assume that a failure to make provision in the agreement resulted not from ignorance of the problem, but from an agreement not to require it." *WirelessMD, Inc. v. Healthcare.com Corp.*, 271 Ga. App. 461, 467 (2005). And when a sophisticated party has demonstrated its know-how but has nevertheless elected to exclude provisions from a contract or refrain from having a party sign certain related document, such decision should be treated as a matter of considered choice evidencing the intent of the parties. *See Flynt v. Life of S. Ins. Co.*, 312 Ga. App. 430, 436 (2011) (insurer "demonstrated that if it wanted to restrict the effective date of a policy provision, it knew how to do so; its failure to do so with regard to the incontestability clause thus should be treated as a matter of considered choice").

Because the Purchase Agreement neither restricts the definition of Actual BCF to exclude advertiser-subsidized revenue nor prohibits Sellers from paying third parties to advertise on Verde's billboard sites during the True-Up Period, Verde's allegation that Sellers falsely inflated the Actual BCF fails. Without a false inflation of the Actual BCF, there is no fraud. Without fraud, there are no predicate acts of mail fraud, wire fraud, or theft by taking, and Verde's RICO claim fails as a matter of law. *See Orix, USA, LP*, 366 Ga. App. at 834–35, 884 S.E.2d at 447 ("[W]hen the underlying actions upon which a RICO claim is premised fail, the RICO claim likewise fails as a matter of law."). Verde's remaining claims derivative claims—that is, Counts 5, 6, 7, 8, 9 and 10 of Verde's Amended Counterclaim—fail for the same reason and should be dismissed.

## V. <u>Conclusion</u>

Irrespective of the Settlement Agreements, Verde has not adequately asserted the necessary factual matter to establish the predicate act of fraud by concealment which is the driving force behind Verde's claims against Renfroe. Indeed, Verde has not just failed to establish that Renfroe committed fraud by concealment, its allegations undercut that theory altogether. Renfroe did not conceal material facts from Verde; rather, its agents and employees were informed of the subject advertising contracts and the funding for the same throughout the time period described in the Amended Counterclaim. Moreover, Verde cannot establish justifiable reliance, and the face of the Purchase Agreement precludes Verde's claims. Thus, Verde's theory of fraud fails as a matter of law and the claims that are derived from it—Counts 1, 2, 5, 6, 7, 8, 9 and 10 of Verde's Amended Counterclaim—necessarily fail and should be dismissed.

Submitted this twenty-third day of March, 2026.

OLIVER MANER LLP

218 W. State Street
P.O. Box 10186
Savannah, GA 31412
(T) 912 236-3311
(F) 912 236-8725
bhunter@olivermaner.com
btuten@olivermaner.com

*s/ Ben T. Tuten*
WILLIAM J. HUNTER
Georgia Bar No. 141288
BEN T. TUTEN
Georgia Bar No. 299110

*Attorneys for Third-Party Counterclaim*
*Defendant John E. Renfroe*

21

## CERTIFICATE OF SERVICE

I hereby certify that on the below date this document was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notifications of such filing to all counsel of record:

Michael P. Kohler, Esq.
michael.kohler@millermartin.com

John E. Floyd, Esq.
floyd@bmelaw.com

Jason M. Tate, Esq.
jtate@robertstate.com

Submitted this twenty-third day of March, 2026.

OLIVER MANER LLP

218 W. State Street
P.O. Box 10186
Savannah, GA 31412
(T) 912 236-3311
(F) 912 236-8725
bhunter@olivermaner.com
btuten@olivermaner.com

*s/ Ben T. Tuten*
WILLIAM J. HUNTER
Georgia Bar No. 141288
BEN T. TUTEN
Georgia Bar No. 299110

*Attorneys for Third-Party Counterclaim*
*Defendant John E. Renfroe*